CONNECTICUT FIRE INSURANCE COMPANY v. WIGGINTON.

## Opinion delivered April 22, 1918.

1. REFORMATION OF INSTRUMENTS—MISTAKE.—Courts will not reform instruments of writing for mistake, unless the mistake is mutual and established by evidence which is clear, unequivocal and decisive.

2. REFORMATION OF INSTRUMENTS—CLAUSE ATTACHED TO POLICY OF FIRE INSURANCE—MISTAKE.—The evidence held to show that, by mistake of all the parties, a loss payable clause was attached to a certain policy of fire insurance instead of a standard mortgage clause, and that the instrument should be reformed.

3. INSURANCE—MISTAKE AS TO TERMS—REFORMATION.—The rule that one taking out a policy of insurance is required to examine it within a reasonable time after he receives it, or he will be deemed to have accepted it, has no application in suits for the reformation of contracts on account of mutual mistake.

4. REFORMATION OF CONTRACTS—MISTAKE.—Where it appears by clear, satisfactory and convincing evidence that the parties to a contract intended to express a different thing from that which was expressed, a court of equity will reform the contract so as to express the real intention of the parties, irrespective of whether one, both or all of the parties thereto availed themselves of the opportunity to read the contract before signing or receiving it.

Appeal from Poinsett Chancery Court; *Archer Wheatley,* Chancellor; affirmed.

*J. A. Watkins,* for appellant.

It was error to decree a reformation of the policy. A mutual mistake is not proven by that clear, decisive and convincing evidence required by courts of chancery. It is not proven that it was intended to attach the "standard mortgage clause" instead of the loss payable clause. 6 L. R. A. 200; 97 U. S. 624; 73 Wis. 203; 61 L. R. A. 137; 38 S. W. 214; 2 Clements, Fire Ins. 600; 82 Ark. 226, 234; 91 *Id.* 171; 71 *Id.* 614; 111 *Id.* 205; 108 *Id.* 103; 105 *Id.* 455; 85 *Id.* 62; 151 U. S. 452, etc.

*Hawthorne & Hawthorne,* for appellees.

The testimony is clear and convincing of a mutual mistake and sustains the reformation of the contract. 76 Ark. 180; 28 L. R. A. (N. S.) 785, 831; 67 N. Y. 283; 77 Am. Dec. 289; 39 N. J. Eq. 66; 127 S. W. 283; 9 Atl.

248; 2 Curt. C. C. 277; 67 S. E. 45; 29 Mo. App. 666; 20 N. E. 77; 93 U. S. 756; 40 Fed. 717; 17 *Id.* 568; 75 *Id.* 338. See also 55 L. R. A. 165; 36 *Id.* 673; 70 Pac. 131; 61 L. R. A. 131; 186 U. S. 423.

HUMPHREYS, J.   Appellees instituted suit in the Poinsett Chancery Court to reform a policy of insurance issued by appellant to J. R. Wigginton on the 4th day of February, 1913, securing him and his mortgagee, the Marked Tree Bank & Trust Company, against loss which might be occasioned by fire to a two-story frame dwelling situated on lot 1, block 3, Ritter's Third Addition to the town of Marked Tree, Arkansas; and to recover the amount of the policy.   It was alleged that through mistake a loss payable clause, in favor of the Marked Tree Bank & Trust Company, was attached to the policy as a part thereof, instead of a standard mortgage clause; that the loss payable clause was subject to the conditions in the policy, and one condition was that no recovery could be had in case foreclosure proceedings were instituted, whereas the standard mortgage clause contained an exemption from that condition in the policy.

Appellant answered, denying that it agreed to attach a standard mortgage clause to the policy and that its failure to attach said clause was a mistake, and set up as a defense that foreclosure proceedings were commenced on the 6th of March by the Marked Tree Bank & Trust Company against J. R. Wigginton before the building was destroyed by fire, which suit, under the contract, voided the policy.

The court heard the cause upon the pleadings and evidence, reformed the policy and rendered judgment for $2,000 and interest in favor of appellee against appellant.

From that decree an appeal has been prosecuted to this court.

(1)   It is contended by appellant that the evidence is not sufficient to establish the fact that it was the intention of the parties to the contract to make the standard

mortgage clause a part of the policy. Courts will not reform instruments of writing for mistake unless the mistake is mutual and established by evidence which is "clear, unequivocal and decisive." *Parker* v. *Carter,* 91 Ark. 162; *Hoffman* v. *Rice Stix D. G. Co.,* 111 Ark. 205; *Eureka Stone Co.* v. *Roach,* 120 Ark. 326. As to whether the court was correct in reforming the policy must depend on whether the evidence clearly shows a mutual mistake was made in attaching a loss payable clause to the policy instead of a mortgage clause. The policy sued on was issued by appellant to appellee Wigginton on the 4th day of February, 1913, and provided that appellant would pay not to exceed $2,000 to appellee Wigginton in case his dwelling situated on lot 1, block 3, Ritter's Third Addition to the town of Marked Tree, Arkansas, should be destroyed by fire within three years after the date of the policy. The loss payable clause contained in the policy was set out in the proof of loss.

M. W. Hazel, the vice president of the bank, testified that upon authority obtained from Wigginton he applied to Paul Leatherwood, appellant's local agent, for the policy, paid him the premium of $50 and requested him to attach a mortgage clause in favor of the bank; that the agent delivered the policy to the bank; that he never read it; that it remained in the possession of the bank until after the fire; that he passed upon loans, and the cashier and loan board looked over the papers securing loans; that Mr. Leatherwood had his office in the bank and wrote all the policies for the bank which protected its loans; that after the fire he got the policy and directed the cashier to attend to making the proof and collecting the insurance; that he was not present at the time the proof of loss was made and knew nothing about its contents; that he first learned of the kind of protection the bank had from his attorney after the policy was delivered to the attorney for collection.

J. C. Hawthorne testified that he prepared the proof of loss, but did not know a mistake had been made in attaching the loss payable clause instead of the mortgage

clause until after he had a talk with Mr. Hazel subsequent to March 6, 1916.

Mr. J. A. Watkins, attorney for appellant, wrote to Hawthorne & Hawthorne, attorneys for appellees, on February 12, 1916, denying liability and calling their attention to an authority which he contended sustained his position and that firm replied on March 6 to the effect that they would test the matter in the courts unless a compromise could be effected. The mistake contended for was not called to the attention of Mr. Watkins by Hawthorne & Hawthorne in their letter to him of date March 6, 1916.

Paul Leatherwood testified on two different occasions. The first time, the substance of his evidence was as follows: That he was in the insurance business and wrote the policy in question but did not remember at whose instance; that he did not remember whether any one told him how to write the policy but that he wrote it according to custom; that he did not know why he placed the loss payable clause instead of the mortgage clause on the policy; that all he remembered was that the bank had a mortgage from Wigginton on the property and paid the premium; that his idea was to protect the bank; that he did not particularly know the difference between the clauses at that time; that he kept a daily report in triplicate, pasted one on the policy, one on daily record book and sent one to the company; that the daily record of this transaction contained the loss payable clause; that he had no recollection of ever placing a mortgage clause on any policy; that his records would show; that Mr. DuBard succeeded him in business and had the records; that he had both kinds of clauses.

The second time his evidence was in substance as follows: That he solicited the insurance from Wigginton, and, while he did not remember about the loss payable clause and mortgage clause, still, if he knew about the mortgage, it was evidently his intention at the time to place a mortgage clause on the policy.

J. R. Wigginton testified in substance that the officers of the bank wanted to make the collateral as strong as possible; that he went to Paul Leatherwood and told him that he wanted to give the bank a mortgage on the policy and asked him what he should do in order to effect that purpose; that he was informed the company furnished blanks and the agent agreed to fill out and attach it to the policy; that in speaking of placing a mortgage on the policy he had reference to a mortgage clause; at the time he did not know the difference between the two clauses.

J. D. DuBard testified, in substance, that he was cashier of the bank and received the policy; that Wigginton owed the bank $2,600 in notes, with W. M. Hazel as endorser on some of them; when the policy was secured Hazel was relieved as endorser on the notes; that he never read the policy; that the stockholders met annually and the directors monthly and examined the affairs and securities of the bank; that he presumed none of the directors read the policy in question; that at the time he received the policy he had every reason to believe that he knew it had a loss payable clause but was not positive about it; that he remembered some policies held by the bank as security had the loss payable clause on them and that he had no recollection of any that contained the mortgage clause; that, at the time, he regarded the loss payable clause the character of protection the bank desired, or that the insurance should be made payable to the bank in case of loss during the life of the mortgage; that he was not sure he knew at the time a foreclosure of the mortgage would void the policy, and, if he had known it and the matter had been left to him, perhaps he would not have accepted the policy with the loss payable clause attached.

The following admission was made by appellant in the course of the trial:

"It is admitted that T. J. Sharum, N. J. Hazel, M. W. Hazel, C. A. Dawson, C. M. Lutterloh, and the other directors of the bank, if present, would testify that they

did not examine or read the insurance policy sued on, and did not know that it had a loss payable clause on it instead of a mortgage clause.''

(2)   It is conceded by learned counsel for appellant in his splendid brief, that recovery may be had on the policy in case it was the intention of all parties to the contract at the time the policy was written to make a part of it a standard mortgage clause.   At the time of making the contract, the insurance company was represented by Paul Leatherwood, and Wigginton and the Marked Tree Bank by M. W. Hazel.   The testimony of M. W. Hazel and J. R. Wigginton is certain and unequivocal to the effect that the agent was told to place a mortgage clause on the policy and that he agreed to do so. Paul Leatherwood, the agent, said in his first testimony that he did not remember who ordered the policy, nor what was said to him, but his idea was to protect the bank.   In his second testimony, he said if he knew about the mortgage, ''it was evidently his intention at the time to place a mortgage clause on the policy.''   The company had furnished him both kinds of blanks and the evidence is conclusive that he knew of the existence of the mortgage, so, in view of this latter statement, there is no escape from the conclusion that he intended to place a mortgage clause upon the policy.   These three parties are the only three who participated in the procurement and execution of the policy, so it may be said with certainty from the evidence that there was a meeting of the minds of all the parties to the contract for a mortgage clause to be attached to the policy.   The failure to attach a mortgage clause and the substitution of a loss payable clause constituted a draft of contract contrary to the intention of all the parties.   Not only is this conclusion sustained by the positive evidence of the parties, but the subsequent conduct of the bank officers points unerringly to the same conclusion.   The bank would not have foreclosed its mortgage without first attempting to have the policy changed had it known that a foreclosure proceeding with the knowledge of the assured would avoid the

policy. The bank evidently intended to procure a policy
of insurance which would not conflict with its right to
foreclose and thought it had done so, else it would not
have instituted foreclosure proceedings. It seems to us
the evidence and conduct of the parties under the con-
tract is clear and convincing to the effect that a mutual
mistake was made in the draft of the contract, and that, as
written, the contract failed to express the intention of the
parties.

(3-4)    We do not understand that the rule announced
in *Remmel* v. *Griffin*, 81 Ark. 269, and later cases, to the
effect that, "one who takes out a policy of life insurance
is required to examine it within a reasonable time after
he receives it, or he will be deemed to have accepted it.
* * *" has any application in suits for reformation of
contracts on account of mutual mistake. When it ap-
pears by clear, satisfactory and convincing evidence that
the parties to a contract intended to express a different
thing from that expressed, a court of equity will reform
the contract so as to express the real intention of the
parties irrespective of whether one, both or all the par-
ties thereto availed themselves of the opportunity to read
it before signing or receiving it. So in the case at bar,
the fact that the cashier received the policy and the bank
retained it for a long period of time without reading it
can not avail appellant as a defense, because it is estab-
lished by clear, satisfactory and convincing proof that
the intention of all the parties to the contract was to
place a mortgage clause and not a loss payable clause,
on the policy.

This conclusion renders it unnecessary to discuss
other questions presented by able counsel in their briefs.
No error appearing, the decree is affirmed.

McCULLOCH, C. J., (dissenting). The policy of
insurance sought to be reformed was issued on February
13, 1913, and was delivered to the Marked Tree Bank &
Trust Company on that date with an endorsement thereon
of what is commonly known as a "loss payable clause."

The building was destroyed by fire on January 9, 1915, nearly two years after the issuance of the policy, without any complaint having been made concerning the form of the endorsement.

A policy of insurance is a written contract between the insurer and the beneficiary, and the right to a reformation of the contract in equity on the ground of mutual mistake must, according to well-settled rules announced by this court, be established by evidence which is "clear, unequivocal and decisive." Three witnesses testified concerning the issuance of the policy, Hazel, one of the officers of the Marked Tree Bank & Trust Company, Leatherwood, the insurance agent who wrote the policy, and Wigginton, the owner of the building. The substance of Hazel's testimony is contained in the following sentence as to his conversation with Leatherwood:

"I would not remember the exact terms, but I called him and told him I wanted him to make out an insurance policy on this property and attach a mortgage clause to it to secure the bank."

The witness did not state what Leatherwood's answer was. He did not say that Leatherwood promised to use any particular form of endorsement nor represented to him, when the policy was delivered, or at any other time, that the policy contained any particular form of endorsement.

Leatherwood testified that he had no recollection of the conversation and that he did not know the difference between a "standard mortgage clause" and a "loss payable clause." Wigginton testified that he did not know the difference between the two clauses in question and merely stated to Leatherwood that he wanted to give the bank "a mortgage on that policy." Leatherwood attached the "loss payable clause" to the policy—that is to say, a clause making the policy, in case of loss of the property by fire, payable to the Marked Tree Bank & Trust Company as its interest might appear—and delivered the policy to the cashier of the bank, who kept it

until the fire occurred without raising any question as to a mistake in the form of endorsement.

The testimony is far from convincing, I think, that a mistake was made. It is not established by evidence "clear, unequivocal and decisive." No witness puts his finger on a form of endorsement and says, "This is what we agreed upon." No witness tells of a promise on the part of Leatherwood, the agent of the company, other than to make an endorsement protecting the mortgagee in case of loss, and he did that by endorsing a clause making the policy so payable.

Moreover, the bank is estopped to dispute the correctness of the policy by the conduct of its officers in keeping the policy for nearly two years without question. It was their duty to read the policy, and, having failed to do so, they can not be heard to say that it does not correctly express the contract. *Colonial & United States Mortgage Co.* v. *Jeter,* 71 Ark. 185; *Pratt* v. *Metzger,* 78 Ark. 177; *Mitchell Manufacturing Co.* v. *Kempner,* 84 Ark. 349; *Stewart* v. *Fleming,* 105 Ark. 37.

In those cases we quoted with approval the following from an opinion of the Supreme Court of the United States:

"It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written. But such is not the law. A contractor must stand by the words of his contract; and, if he will not read what he signs, he alone is responsible for his omission." *Upton, Assignee* v. *Tribilcock,* 91 U. S. 50.

We have applied this doctrine in cases concerning the acceptance of insurance policies. *Remmel* v. *Griffin,* 81 Ark. 269; *Smith* v. *Smith,* 86 Ark. 284; *Gray* v. *Stone,* 102 Ark. 146.

The only exception to the rule is that where there has been a fraudulent representation concerning the contents of an instrument, the party relying upon such rep-

resentation and being induced thereby to refrain from reading the contract, is not estopped to question its correctness. *Stewart* v. *Fleming,* 96 Ark. 371. There is no such element as that in the present case, for it is not claimed by any witness that Leatherwood made any representations when he delivered the policy, or at any other time, as to the kind of endorsement he had made on the policy. It is clear from the testimony that when Leatherwood made the endorsement it was thought to be sufficient to protect the bank, and was accepted as such. If Mr. Hazel had in mind any particular form, which he now says he wanted endorsed on the policy, his testimony does not show that he specified it in his directions to Leatherwood. The bank could have protected itself if the officers had informed themselves of the contents of the policy and the endorsement thereon, and complied with the terms of the policy, and, having failed to do so, the bank is estopped to assert now that the policy is not in accordance with the intention of the parties.

For these reasons I dissent from the conclusion reached by the majority.

Mr. Justice HART concurs in these views.