LAMMERS *v.* ARKANSAS POWER & LIGHT COMPANY.

4-5056

Opinion delivered May 2, 1938.

W. A. *Jackson, Smith & Judkins* and *Richardson & Richardson,* for appellant.

*House, Moses & Holmes, H. L. Ponder, Jr.,* and *H. L. Ponder,* for appellee.

DONHAM, J. Appellant, plaintiff below, instituted this action in the chancery court for the Eastern District of Lawrence county to reform a contract which he alleged had been entered into between him and the appellee, and for the further purpose of recovering damages because

of an alleged breach of the contract. Appellee filed a demurrer to the complaint, which the court sustained over the objection and exception of the appellant. Appellant refused to plead further, and elected to stand on his complaint. The court thereupon dismissed the complaint for want of equity, to which action of the court appellant objected and properly saved his exception. From the action of the court in dismissing his complaint, the appellant prayed and was granted an appeal to this court.

Plaintiff alleged in his complaint that he was the owner of two farms in Jackson county; that he desired to grow rice on these farms; and, large quantities of water being necessary in the growing of rice, he became interested in using electricity in pumping the necessary water to irrigate his said farms. He alleges that he was interviewed by one P. O. Peterson, Jr., and one John Fitzgerald, agents of appellee, who interested him in a contract by which appellee was to furnish the electricity necessary for his farming purposes; that on several occasions he was solicited and encouraged by said Peterson to enter into such a contract with appellee; that finally he consented to enter into a contract for the purchase of electricity to do the necessary pumping for his rice farming purposes; that he executed four contracts in quadruplicate on printed forms supplied by appellee through its agent, the said P. O. Peterson, Jr.; and that after the blanks in said printed forms had been properly filled in, he read only such parts of said contracts as pertained to the length of time he should use the electricity and when he should pay therefor. He alleges that he was assured by said Peterson, as agent for appellee, that all four copies of each contract would be sent to the home office of appellee and there approved, and that one copy of each would be returned to him; that relying on the belief that said contracts would be executed, he planted his farms in rice and drilled wells to supply the water; and that after his rice crops had come up and were beginning to need water, he went to Newport to see the said Peterson and Fitzgerald for the purpose of advising

them of the necessity of his being furnished the electricity and to inquire of them why he had not received his copy of each of said contracts. He alleges that he was assured by them that the appellee was going to supply the necessary current on what appellant called his "Amagon Farm," and was told that appellee would commence the erection of the power line to said farm within a very few days, and that he could rely upon said statements; and that after the lapse of a few days, appellee having failed to erect said line and to supply said current, he went again to see said agents and was again assured that the line would be erected and the current furnished. He alleges that he made repeated trips to see said agents, advising them that he was in serious need of said current and demanding of them that he be supplied with same; that upon each occasion said agents assured him that appellee was going to supply same, without fail; and that he relied on said statements. He further alleges that on June 15, 1936, he was informed through said Fitzgerald that appellee would not erect a line to supply current to his "Amagon Farm."

The proposed contracts which were signed by appellant contained the following clause:

"This contract and the several terms thereof shall be in full force and binding upon both parties hereto, their heirs, successors and assigns from date of signature hereto upon approval of company through its general manager, for the period hereinbefore set forth."

Appellant alleges that he did not know and had never been advised that said contract contained said clause; that he had considered himself bound by said contracts since he had signed same; that the appellee and its said agents, negligently, wilfully, heedlessly and recklessly, failed and refused to return said contracts to him within a reasonable time or to advise him that they contained said clause; and, thus, the appellee and its said agents, while acting within the apparent scope of their agency, negligently, wilfully, heedlessly and recklessly, and by their gross indifference to the rights of appellant, induced him to believe that said contract was binding,

and that it would be performed by appellee, and that at the proper time said current would be furnished so that he could properly irrigate his rice lands; that by reason of his reliance upon the execution of said contracts by appellee, he suffered a great loss; that in equity and good conscience, appellee is and should be estopped to rely on said clause in said contracts; and that said contracts should be reformed, so as "to supply the approval of said general manager as of a reasonable date after the time they were executed by plaintiff, or they should be reformed so as to omit said clause therefrom, in order that plaintiff may enforce his rights in the premises."

Appellant further prayed that, should the contracts be reformed, he be given judgment for damages in the sum of $21,072.55. He alleged that had appellee performed said contracts, he would have produced approximately 26,775 bushels of rice at a market value of approximately $1.10 per bushel, at a cost of approximately $8,521.75; and that after said agents had told him that said current would not be furnished him, he believed he might save said crops and then, during the next fifteen days, ordered repairs for and repaired an oil engine at an expense of $141.80, and then irrigated said farm for about fifty days; but that it was too late to save any part of said crops, and same were, therefore, a total loss.

The only question here to be decided is whether the lower court committed error in sustaining the demurrer to appellant's complaint.

From the above-quoted clause contained in the proposed contracts, it is seen that said contracts were not to be effective until approved by appellee, through its general manager. In other words, the company had not yet entered into the contracts; that is, the proposed contracts were not to be considered binding upon it until it had indicated its approval, through its general manager.

Appellant contends that he did not know the proposed contracts contained the clause hereinabove quoted; that he signed the contracts without reading them; and that he had no knowledge that they contained said clause at the time he signed them. Appellant's failure to read

the contracts and his lack of knowledge of what they contained, under the circumstances, avail him nothing.

In Page on the Law of Contracts, vol. 1, § 271, it is said:

"On the other hand, if he can read or is otherwise guilty of negligence in not informing himself as to the contents of the written contract, and signs or accepts it with full opportunity of informing himself as to its contents, he cannot avoid liability on the ground that he was mistaken as to its contents in the absence of fraud or misrepresentation."

In the case of *Stone* v. *Prescott Special School District,* 119 Ark. 553, 178 S. W. 399, this court said: "We think the demurrer should have been sustained. It has been several times said by this court that one who has an opportunity to read a contract before signing it cannot escape its obligation by saying that he signed it without having read it."

In the case of *Connecticut Fire Insurance Co.* v. *Wigginton,* 134 Ark. 152, 203 S. W. 844, this court quoted with approval from *Upton* v. *Tribilcock,* 91 U. S. 45, 23 L. Ed. 203, as follows: "It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written. But such is not the law. A contractor must stand by the words of his contract; and, if he will not read what he signs, he alone is responsible for his omission."

The law is such that appellant will not be heard to say that he did not know that the quoted clause hereinabove shown was in the proposed contracts which he signed. Whether he knew the proposed contracts contained this clause or not, he knew that the agents of the company with whom he had conferred had no authority to make the contracts. He was bound to know that the contracts did not become effective until approved by the company, through its general manager. All copies of the four contracts were sent to the home office of the com-

pany at Pine Bluff to be approved by the company, with the understanding that a copy of each was to be returned to appellant. Therefore, he must have known that the contracts would not be effective until same had been approved by the company and copies returned to him.

Appellant pleads estoppel; that is, he contends that appellee is in no position to deny the existence of the contracts. He alleges in his complaint that Peterson and Fitzgerald, agents of the company who had interested him in the matter of making the contracts, had told him that the company would build the electric line and supply the current, and upon these representations he proceeded to drill wells, purchase electric motors, pumps, etc., necessary to pumping the water to be used in growing his rice crops. He alleges that he relied on the representations of these agents of the company. Appellant knew that these agents had no authority to make a contract with him for the building of the line and the furnishing of the current. Otherwise, it would not have been necessary to send the contracts to the home office of the company at Pine Bluff to be approved by the general manager of the company. He must have known that the contracts would not be binding until approved by the general manager, for he alleges that he made inquiry of Peterson and Fitzgerald about the approval of the contracts and a return of a copy of each of same to him. Since these agents of the company had no authority to make the contracts in the first instance, nothing they could do would ratify them so as to bind the company.

In Fletcher Cyclopedia Corporations, Permanent Edition, vol. 2, § 760, it is said:

"Unauthorized or irregular contracts or other acts by the officers or agents of a corporation cannot be ratified except by a person or persons having authority to authorize the same and bind the corporation. Obviously, an officer or officers who have no power to do or authorize an act have no power to ratify such an act."

Again, in Page on the Law of Contracts, vol. 3, § 1804, it is said:

"A contract of an agent in excess of his authority can be ratified only by an agent or officer who had authority to make such contract in the first instance."

These basic principles are so well known that it is not necessary to cite further authorities in support thereof. Neither Peterson, nor Fitzgerald, nor both together, had any authority to make the proposed contracts in the first instance, and the allegations as to their statements in assuring appellant that the appellee intended to build the electric line and furnish the current necessary for his farming operations were not sufficient to estop appellee from denying the existence of the alleged contracts. Courts have no power to make contracts. They can only enforce such contracts as have been made by the parties themselves. To grant appellant the relief prayed could only be done on the theory of the existence of the contracts in question. These contracts did not exist and appellee was not estopped to deny their existence.

In appellant's complaint will be found the following:

"That said contract should be reformed, so as to supply the approval of said general manager as of a reasonable date after the time they were executed by plaintiff, or they should be reformed so as to omit said clause therefrom, in order that plaintiff may enforce his rights in the premises."

Thus, it will be seen that appellant desires that the agreement of appellee to the proposed contracts be supplied by court action. This would be nothing short of the courts' making the contracts for the parties. The court cannot supply the approval of one of the parties; for, if the minds of the parties have not met, there is no contract.

The lower court held:

"That there was no contract and that the court cannot make a contract where none existed between the parties. That the agreement in question was nothing but a proposal for a contract. That the minds of the contracting parties had never met, and this was all admitted. That it was simply a proposed contract depending alone upon one thing, and that was to secure the general ap-

proval of Mr. Frank M. Wilkes, who was the general manager of the appellee company and who lived at Pine Bluff.''

In this holding the learned chancellor was correct. There being no contract between the parties, and the appellee not being estopped to deny the existence of a contract, the court was correct in sustaining the demurrer. The judgment is, therefore, affirmed.