WOODMEN OF THE WORLD LIFE INSURANCE SOCIETY
*v.* COUNTS.

4-9869

252 S. W. 2d 390

Opinion delivered November 3, 1952.

Rehearing denied December 1, 1952.

*W. H. Glover,* for appellant.

*H. B. Means, Jr.,* and *J. C. Cole,* for appellee.

ED. F. McFADDIN, Justice. Appellee, Gus Counts, as beneficiary,[1] filed action against appellant, Woodmen of the World Life Insurance Society (hereinafter called "Woodmen Society") to recover double indemnity bene-

---

[1] Mrs. Counts, wife of Gus Counts and mother of Junior Counts, was also a beneficiary in the policy and a party to this litigation.

fits on a life insurance policy issued to Junior Counts, the son of appellee. For defense, the Woodmen Society claimed, *inter alia*, that the policy had no double indemnity benefits. The jury verdict was for the plaintiff, and the Woodmen Society brings this appeal. Appellant questions the sufficiency of the evidence to support the verdict; and this necessitates a statement of facts, viewing the evidence in the light most favorable to the verdict.[2]

On March 10, 1951, appellee contacted Mr. Edmondson, Secretary of the local camp of the Woodmen Society, and requested a life insurance policy with double indemnity benefits on the life of Junior Counts, the 25-year-old son of appellee. Edmondson completed the application blank which, it is admitted, included double indemnity benefits; and Edmondson accepted appellee's check for $30.54, which was the annual premium according to an old rate book in Edmondson's possession. Junior Counts was not at home at the time, so his sister signed the application with the consent of Edmondson and appellee. Later the same day, Junior Counts fully ratified all that had been done.

Edmondson forwarded the said application and check to Mr. Watkins, assistant State Manager for the Woodmen Society. Watkins discovered that according to a new rate book, the correct premium was $32.54; and sent that amount and the application to the home office of the Woodmen Society in Omaha, Nebraska, where the application was to receive final action. On March 29, 1951, the President of the Woodmen Society wrote Junior Counts a letter, saying, *inter alia*:

"I am happy that your application for membership in our Society has been approved. Your certificate has been mailed to our Representative for delivery to you. You will please make future payments on your certificate to the Financial Secretary of your Camp, whose name and address appear on the enclosed recognition card."

[2] The rule is well settled that in determining whether the evidence is sufficient to support the verdict, this Court views the evidence in the light most favorable to the party who won the verdict. See *Oviatt* v. *Garretson*, 205 Ark. 792, 171 S. W. 2d 287; and other cases collected in West's Ark. Digest "Appeal & Error," § 930.

Notwithstanding the fact that the letter said the application had been accepted, it appears that in fact it was not accepted *in toto*: when the application was submitted to the Medical Examiner of the Woodmen Society, he observed that Junior Counts was of draft age, and instructed that the policy be issued without double indemnity benefits, as was the practice in effect at that time by the Woodmen Society. So the policy, as actually issued on April 1st and delivered some two weeks later, had no double indemnity benefits. But this fact—that the policy had no double indemnity benefits—was never actually known by Junior Counts or the appellee, Gus Counts, because the policy was not read by either of them.

Junior Counts left Arkansas about March 21st and never personally received either the letter of March 29th or the policy, but his father, Gus Counts, received both the letter and the policy and read the letter; and Gus Counts acted as the agent of the insured, Junior Counts, in all matters herein. Aside from the policy, no information, written or oral, was ever conveyed to the insured or the beneficiary to the effect that the policy did not have double indemnity benefits, just as the application had stated. There was no return of any premium for failure to have double indemnity benefits.

In June, 1951, Junior Counts died by accidental drowning in California, and his death was within the provisions of double indemnity benefits. Appellee Counts filed claim as beneficiary under the policy. The Woodmen Society paid the life insurance benefits, but resisted the double indemnity benefits, and this action resulted.

Preliminary to the principal issues, we point out:

(a) The signing of the application by the insured's sister, having been ratified, gives to the Woodmen Society no right to say that the insured never applied for a policy; and (b) the actions of the appellee, Gus Counts, for his son, Junior Counts, were in all instances the same as if the son had acted, for the father was the agent and had the right to receive the letter and policy for his son.

The case of *Inter-Southern Life Ins. Co.* v. *Holzhauer,* 177 Ark. 927, 9 S. W. 2d 26, points to our decision in the case at bar. In the reported case, Holzhauer applied to the agent Logsden for life insurance with double indemnity benefits, and the agent advised him that such benefits would be effective immediately on issuance of the policy. The policy, as issued on September 4, 1925, provided that the double indemnity benefits would be delayed one year before being effective, but when the company sent the policy to Holzhauer, it was enclosed in a letter which said:

"Enclosed please find your policy . . . being the same as applied for and explained to you by our Mr. P. H. Logsden, Agent."

Holzhauer never read the policy and never knew that the double indemnity benefits would be delayed one year. He was accidentally killed on January 5, 1926, after the issuance of the policy on September 4, 1925; and his beneficiary sued for the double indemnity benefits. This Court, in holding that the insurance company had estopped itself when it wrote the letter to Holzhauer, as above quoted, said:

"This brings us, in the final analysis, to the crux of the lawsuit—that is, whether the letter from the appellant's State manager to the insured, taken in connection with the other facts, was sufficient to estop the company and thereby enable appellee to obtain the relief sought. A majority of the court has reached the conclusion that the appellant is estopped. . . ."

And quoting from 32 C. J. 1135, the Court said:

" 'Even where there is a mistake, and both parties act in good faith, yet when the mistake is that of the company or its agents, and it reasonably induces the other party to believe that he is insured, the company is estopped to deny the effectiveness of the insurance. The delivery of a policy with the assurance that it is in compliance with the application is a waiver of an agreement that the insured would notify the company if the policy

were not right.' . . . See, also, *Fidelity Insurance Company* v. *Palmer*, 91 Conn. 410, 99 Atl. 1052. See, also, *Connecticut Fire Insurance Co.* v. *Wigginton*, 134 Ark. 152, 203 S. W. 844; *Stewart* v. *Fleming*, 96 Ark. 371, 131 S. W. 955. The appellant is clearly estopped from asserting that the policy is different from that which its agents represented it would be."

So in the case at bar, the application of Junior Counts was for double indemnity benefits. No one ever advised him or his father for him that the policy was not exactly as applied for: quite to the contrary, the President of the Woodmen Society wrote Junior Counts: "Your application . . . has been approved. . . ." The estoppel is as strong in the case at bar as in the reported case.

The holdings in other jurisdictions are in accordance with our holding in the Holzhauer case. In 29 Am. Jur. 155, the rule is stated:

"Moreover, according to some authority, notification to an applicant for life insurance of the arrival of his policy, by the local agent who received the application and to whom the policy was forwarded for delivery, completed the contract of insurance, which the insurer could not deny after loss although in fact it had issued a different form of policy from that applied for, where it had notified the agent to secure an amendment to the application to make it conform to the policy issued, which the agent failed to do."

To sustain the above quoted statement, there is the case of *Kimbro* v. *N. Y. Life Ins. Co.*, 134 Iowa 84, 108 N. W. 1025, 12 L. R. A., N. S. 421.[3] Likewise, in *Robinson* v. *U. S. Ben. Soc.*, 132 Mich. 695, 94 N. W. 211, 102 A. S. R. 436, the Supreme Court of Michigan, in holding an insurance company liable in a case where the insured was informed that the application had been accepted, said of the defendant insurance company:

[3] There is an Annotation on the point in 12 L. R. A. N. S. 421; and see also *Rake* v. *Century Ins. Co.*, 148 Iowa 170, 125 N. W. 207; and *Lewis* v. *State Mut. Ins. Co.*, 115 W. Va. 405, 177 S. E. 449.

148

"The duty of the defendant was to issue the policy in compliance with the terms of the application. If it chose to insert inconsistent provisions, it was its duty to call the attention of the insured to them, so that he might accept or refuse the policy. The insured has the right to assume that his policy will be in accordance with the terms of his application, and he cannot be bound by a different policy, until he has had the opportunity to ratify or waive the inconsistent provisions: See, also, *Gristock* v. *Royal Ins. Co.*, 87 Mich. 428, 49 N. W. 634, and authorities there cited."

Appellant argues that Gus Counts, the beneficiary, is in no position to claim that the company is estopped; and this is on the theory that the son never received the letter and so did not change his position in any way in reliance on the letter stating the application had been accepted. In the Holzhauer case the beneficiary claimed the estoppel because of the letter to the insured. When we say, as we do, that the letter to Junior Counts being received by his father was the same as being received by him, then this case is exactly within the rule of the Holzhauer case. The Woodmen Society actually knew that Gus Counts had issued his check to pay the premium[4] for his son. If Gus Counts had known that there were no double indemnity benefits on this policy, he, acting for his son, could have applied to some other company for double indemnity benefits.

The appellant argues that under the by-laws and rules of the Woodmen Society, the medical examiner was correct in directing that a policy would not be issued with double indemnity benefits to a person of draft age; and appellant says that both Junior Counts and the beneficiary, Gus Counts, are bound by such rules of the Woodmen Society, and therefore cannot claim double indemnity benefits. The answer to this argument is: (a) that a policy with double indemnity benefits was not an illegal act; (b) that the Woodmen Society could waive its own by-laws and issue the policy if it so desired; and (c) that

---

[4] The check of Gus Counts was forwarded to Mr. Watkins, the Assistant State Manager of the Woodmen Society.

the action of the President of the Woodmen Society in advising the insured: "Your application . . . has been approved," constituted such waiver. In 44 C. J. S. 1092, the holdings on this point are stated:

"In general the company may waive any provisions in the policy or in its constitution or by-laws which are intended for its benefit, but it cannot by waiver or estoppel validate a contract which is entirely void or forbidden by law."

Finally, there is the contention that the appellee, Gus Counts, for himself and for the insured, Junior Counts, is charged with knowledge that the policy did not contain double indemnity benefits because Gus Counts kept the policy, even unread, from its receipt in April until the death of the insured on June 8th. It is argued that such holding of the policy constituted a ratification of its provisions, even though contrary to the application. Ratification in a case such as the one here must be based on evidence (a) that the insured or his agent *knew* of the variance between the policy and the application and kept the policy after such knowledge; or (b) that the insured or his agent kept the policy for such a long period of time that knowledge can be implied from such delay. The facts entirely negative any actual knowledge under "(a)" above; but appellant strenuously urges "(b)" above, and refers to the case of *Inter-Southern Life Ins. Co.* v. *Holzhauer (supra)*, in which we said:

"Unless the insured was induced by the insurance company, or its agent, not to read his policy, it would be manifestly unjust to the company to allow him to retain the policy an unreasonable time, or until his note became due, and then plead that the policy did not express the contract. Because, in the meantime, he had been insured, and if he had died the company would have had to pay. Hence under those circumstances he would be estopped."

But in the said Holzhauer case, the policy was dated September 4, 1925, and the insured died on January 5, 1926, so the insured had the policy four months, yet he was not held in law or in fact to have ratified the variance

between the application and the policy. In refusing the defense of the insurance company, the Court said:

"But if the insurance company . . . has so misled the insured and caused him not to read . . . the policy, then the insurance company, when suit is brought against it by the beneficiary . . . cannot defend on the ground that the insured did not read the policy, . . . or return the policy within a reasonable time. For, under such circumstances, it would be obviously unfair . . . to permit the company to take advantage of its own wrong, . . . Under such circumstances the company is estopped."

In the case at bar, the policy was dated March 23, 1951, and actually received by the appellee for his son sometime in April, 1951. The insured died on June 8, 1951; so there is less elapsed time between receipt of the policy and death of the insured in the case at bar than there was in the Holzhauer case. Furthermore, the letter written by the President of the Woodmen Society in the case at bar was equally as strong as was the letter in the Holzhauer case; and in each instance such letter apparently made unnecessary the reading of the policy.

The judgment is affirmed.

WARD, J., dissenting. I can not agree with the majority opinion herein for the reasons set out below.

Regardless of what view one may take of the case, I take it that appellees can win only on the ground of estoppel. Briefly, the facts that must be relied upon to constitute estoppel are as follows: The son [through his father] applied for a $1,000 insurance policy with double indemnity; appellant's president sent out a form letter to the father stating the application had been approved, saying nothing about double indemnity; the form letter stated that the policy [certificate] would follow; the certificate did follow and came into the possession of the father about two weeks after receipt of the form letter; if the father had read the certificate, it would have informed him that double indemnity had been eliminated. Up to this point I will concede, for the

sake of argument only, that the father was misled to the point that the plea of estoppel would lie. However, there are other facts that must be considered.

It is conceded that the son left home before the form letter was received by the father and, further, that the father was never at any time before the death of the son able to contact the son. Conceding this, it must also be conceded that the father, even if he had read the certificate or had never received the form letter, could have done absolutely nothing about obtaining double indemnity from the appellant or any other insurance company. There is no way that I can think of in which the father was damaged or hurt. The only thing he could have done [and I think he had no legal right] was to cancel the policy, get his $30.00 back and lose the $1,000.00 which he has received.

Since the father was in no way hurt or damaged [by being misled, if he was] estoppel will not lie. This is the universal rule of this and all other jurisdictions.

*Nakdimen* v. *Baker,* 111 F. 2d 778, holds: an indispensable element of estoppel is a detrimental change of the party asserting it.

*Gambill* v. *Wilson,* 211 Ark. 733, 202 S. W. 2d 185, states in substance: the principle of equitable estoppel is that when a person has deliberately done an act or said a thing, and another person who *had a right* to do so has relied on that act or word and *shaped his conduct accordingly* AND WILL BE INJURED, estoppel will lie.

*Peoples National Bank of Little Rock* v. *Linebarger Const. Co.,* 219 Ark. 11, 240 S. W. 2d 12, holds: one, who, by his act or conduct, leads another to do *what he would not have otherwise* done shall not subject such person to LOSS OR INJURY by disappointing expectations upon which he acted.

*Schuman* v. *Stevenson,* 215 Ark. 102, 219 S. W. 2d 429, is to the effect: before a party will be estopped it must be shown that the party relying on the estoppel

is put to a DISADVANTAGE and has been led to CHANGE HIS POSITION FOR THE WORSE.

In *Lewin* v. *Telluride Iron Works*, 272 F. 590, Judge SANBORN said:

"The indispensable elements of estoppel are: (1) ignorance of the person who invokes estoppel; (2) a representation by the party estopped which misleads; (3) an innocent and detrimental change of the party asserting . . ."