UMBERGER v. WESTMORELAND.

4-9461          238 S. W. 2d 495

Opinion delivered April 9, 1951.

*Giles Dearing,* for appellant.

*J. L. Shaver,* for appellee.

ED. F. McFADDIN, Justice. In this suit the husband is seeking to claim as his own certain property that was in his wife's possession at the time of her death.

W. R. Umberger [1] and Maggie Umberger were married in Tennessee in 1919, and from 1923 lived in Cherry Valley in Cross County, Arkansas. They had no children. Mrs. Umberger died August 28, 1947, and by her will gave her husband (a) the use of the family residence for his lifetime, and (b) one-seventh interest in her estate. The other six-sevenths interest went in equal shares to Mrs. Mattie Lou Westmoreland (a niece whom the Umbergers had reared), and to Mrs. Westmoreland's five children. Mr. Umberger and Mrs. Westmoreland were named co-executors of the will. When Mrs. Umberger's bank safety deposit box was opened in the presence of the interested parties on September 10, 1947, there were found the will, some deeds, Government bonds, postal savings certificates, bank books, and cash in excess of $6,500.

On September 22, 1947, Mr. Umberger (appellant) filed the present suit in the Chancery Court, seeking to recover all the cash in the safety deposit box, and to have title to the real estate vested in him. The defendants, as the issues were finally joined, were Mrs. Westmoreland (individually and as executrix) and also Mrs. Westmoreland's five children. The defendants pleaded by general denial. Evidence, taken by depositions over a period of many months, has resulted in a transcript in excess of 400 pages, in addition to voluminous exhibits.

---

[1] In some places the name is spelled "Umberger," and in others it is spelled "Umbarger."

The Chancery decree was adverse to Mr. Umberger in every respect except as to $840 in the safety deposit box; and he has appealed. Mrs. Westmoreland, as executrix, has prosecuted a cross-appeal (a) from that portion of the decree which gave Mr. Umberger $840 of the cash in the safety deposit box, and also (b) from that portion of the decree concerning alleged gifts of the money in the safety deposit box.

I. *The Real Estate.* In Mrs. Umberger's safety deposit box there was a deed, dated and recorded in 1937, whereby John Dye, and wife, conveyed to Mrs. Umberger a tract of approximately six acres. Mr. Umberger testified that Mrs. Umberger handled the details connected with the acquisition of this tract; that he gave her the money to pay for the land; that they agreed the deed was to be made to them as tenants by the entirety; that she told him it was so made; and that he did not know otherwise until after her death. With such testimony, he cites *McCollum* v. *Price,* 213 Ark. 609, 211 S. W. 2d 895, as authority for his claim that the deed should be reformed to show him as tenant by entirety.

But there is testimony that Mr. Umberger admitted this tract belonged to his wife. The witness, Owens, testified that she lived near the tract in question:

"Q. Did you ever talk to Mr. Umberger about buying a strip off that six acres?

"A. I asked him one time if he would sell me an acre and he said he couldn't; that it belonged to 'the madam.'

"Q. When was that conversation?

"A. I don't remember. It was after we moved there; in the last four or five years. I tried to buy it from her, too."

Such disclaimer of ownership made by Mr. Umberger is at complete variance with the claim he is now making; and in the light of the foregoing testimony, and other testimony showing ownership in Mrs. Umberger, we are unable to say that the Chancery decree is in error in refusing Mr. Umberger's claim to the six acre tract.

In the safety deposit box there was a deed dated in 1937, and recorded in 1938, whereby Mr. Umberger conveyed to his wife an 80 acre tract and also some town property in Cherry Valley. The title to all of this property had been originally in Mr. and Mrs. Umberger, as tenants by the entirety, and he deeded the property to her in 1937. In seeking to have the said deed to his wife cancelled, Mr. Umberger first denied the execution of such deed,[2] and then made two claims as to why the

[2] Here is a portion of his testimony:

"Q. A deed was found in there dated December 18, 1937, from W. R. Umberger to Maggie Umberger for all of your lands, together with some live stock. Did you execute such a deed to her?

"A. If I did I didn't know it. The 80 acres of land that we agreed that when I was in that law suit with Mr. Marberry and them, she thought they was going to get a judgment against me, and she asked me to make a deed to the 80 acres of land until we got it settled so if they got a judgment against me that they wouldn't get the land. That is all that is supposed to be in the deed and I didn't know any better until the lock box was opened."

[3] Here is his testimony:

"Q. In that box was found that day a note signed by you to Mrs. Umberger for the sum of $320, did you give her such a note?

"A. I don't never remember giving her such a note.

"Q. I will ask you whether or not you knew a Floy Williams?

"A. Yes, sir, I knew Floy Williams.

"Q. Was Floy Williams a man or woman?

"A. A woman.

"Q. What business was she engaged in?

"A. A grocery store.

"Q. Where?

"A. In Cherry Valley.

"Q. Did you or not trade with her?

"A. I think I bought my first groceries from her when I first landed in Arkansas.

"Q. Did you continue to trade with her?

"A. I traded with her as long as she lived.

"Q. Tell the court whether or not you or Maggie ever got any money from Mrs. Floy Williams.

"A. I can't answer that correctly. If she did I can't remember. If I did I paid her back. I never kept no account of that. I could have but I couldn't tell you what it was for.

"Q. You don't know now what it was for?

"A. No, sir, I couldn't.

"Q. Tell the court whether or not Mrs. Umberger came to you and reported to you that Mrs. Williams was demanding $320.

"A. Yes, sir, she did.

"Q. Did she or not offer to let you have the $320 to pay Mrs. Williams?

"A. As far as I remember she did or went and paid it off, one.

"Q. You mean she either gave you the money or gave it to Mrs. Williams?

deed should be set aside: First, he claimed he executed the deed to put the title in his wife until some of his "troubles" were surmounted, and then she was to deed the property back to him. In this claim Mr. Umberger was seeking to ingraft by parol and express trust on a written instrument; and his attempt must fail. See § 38-106, Ark. Stats.; *Glover* v. *Glover,* 153 Ark. 167, 240 S. W. 716; *Harbour* v. *Harbour,* 103 Ark. 273, 146 S. W. 867. *Carpenter* v. *Gibson,* 104 Ark. 32, 148 S. W. 508.

Secondly, Mr. Umberger claimed that he executed the deed to Mrs. Umberger as a mortgage to secure a debt of $320; and he claims the debt has been fully paid. It is true that a deed may be shown to be a mortgage; but the evidence to such effect, in a case like this one, must be "clear, unequivocal and convincing." See *Edwards* v. *Bond,* 105 Ark. 314, 151 S. W. 243 and 151 S. W. 281. See, also, cases collected in West's Arkansas Digest, "Mortgages," § 36. Mr. Umberger claimed that he might have executed a lien of some kind to Floy Williams, and then conveyed the property to Mrs. Umberger as security in order to obtain money to repay Floy Williams. Mr. Umberger's testimony is very indefinite on this point[3]; but he claims that Mrs. Umberger left a written memorandum that the deed to her was a mortgage.

At least five "books" were introduced in evidence, each said to be in the handwriting of Mrs. Umberger. We have examined the originals and find them to contain all sorts of information and writings. The dates and entries do not follow in any sort of continuity. The entries appear to be addresses, telephone numbers, memoranda, diary entries, debits, credits, and similar matters which were probably quite intelligible to the person making the entries but which, to us, appear to be too haphazard to constitute sufficient evidence on which to declare a deed to be a mortgage. The writing relied on by Mr. Umberger is found on page 123 of one such "book," which reads:

"A.   Yes, sir.
"Q.   Were any papers fixed up between you and Mrs. Umberger at that time?
"A.   Well, I couldn't say positive but I believe it was.   I don't remember.   As it stands I must have."

"Dec 18, 1937, paid W. R. Umberger three hundred twenty dollars on Floy Williams Mortgage hold mortgage at ten cents per year on dollar
Mar, 1938, paid Dearing twenty-five
May 31, 1938, paid $200 for W.R.U. License mortgage two bales of cotton & car

"9/16    6.31
         2.00 on tire
         ————
         8.31"

Mr. Umberger claims that the first portion of the above entry shows that the deed he executed to Mrs. Umberger was a mortgage. This entry could just as well mean that Mrs. Umberger paid Mr. Umberger the money so that he could pay Floy Williams; it could mean that Floy Williams had executed a mortgage to Mr. Umberger which Mrs. Umberger was paying; or it could mean some entirely disconnected transaction not disclosed by the evidence. At all events, in view of Mr. Umberger's indefinite testimony we cannot say that this memorandum, susceptible as it is of several interpretations, is sufficient to be that "clear, unequivocal and convincing" evidence which is required to show that a deed is a mortgage. So we affirm the Chancery decree which denied Mr. Umberger's claim as to all of the real estate, with Mr. Justice ROBINSON of the opinion that the Chancery decree should be reversed as to the real estate.

II. *Cash in the Safety Deposit Box.* Approximately $6,530 in currency was found in Mrs. Umberger's safety deposit box; and Mr. Umberger claims this to be his money which Mrs. Umberger had purloined. He testified that in order to prevent her from cashing checks on his account, he began the practice, sometime after 1935, of exchanging his money for large currency ($10, $20, $50 or $100 bills), and then concealing such currency in and around his liquor store and home. He introduced a book in which he claimed he had made entries from time to time so he could remember the amounts of money at the various places of concealment, such as "in bottom trunk," "behind picture," "in wardrobe," "under cash register," etc. He further testified that Mrs. Umberger

found his money in the various hiding places and appropriated it to her own use, and that the currency in the safety deposit box was the identical currency that he had secreted in the various hiding places.[4]

To say the least of it, Mr. Umberger's story is quite bizarre: the husband and wife had been married since

[4] Here are specimens of his testimony:

"Q. When did you first discover that this money was stolen?

"A. I never put down no date, Mr. Shaver, because when I went to see about it it was gone and I didn't know what date it left.

"Q. You were the only one who had the key?

"A. Part of the time I had the key and part of the time I didn't.

"Q. Who else had the key?

"A. My wife had the key but she didn't know it was hid there.

"Q. You don't say your wife stole that money?

"A. Yes, sir, she got it.

"Q. Mr. Umberger, did you ever report any of these thefts to the law?

"A. No, there wasn't no need of it. She was my wife and I would ask her about it.

"Q. You just didn't want to have her arrested?

"A. No, sir, I didn't. I had to live with her.

.  .  .  .  .

"Q. Did you say anything to her about it?

"A. I got after her about these things but she, if she wanted to answer me she did and if she didn't she wouldn't give me any answer at all.

"Q. And that was satisfactory to you?

"A. There was no need of my saying nothing because I knew I couldn't make her give it back to me.

"Q. Did she say she got it?

"A. I don't remember she ever give me any answer.

.  .  .  .  .

"Q. Did you ever report that?

"A. I asked her about it. She admitted sometimes that she'd take it and sometimes I couldn't get anything out of her.

.  .  .  .  .

"Q. You knew she had a lock box?

"A. She told me she had, I didn't know.

"Q. She didn't let you in it?

"A. No, sir.

"Q. So the bonds were a thousand dollars and five hundred dollars that she told you about.

"A. She told me about taking out some more.

"Q. When was that?

"A. I don't remember what date it was but that wasn't all the money she got out of my pocket. She got $400 one time and she said she took out a $400 bond and another time I went to Memphis and come back and she got $600 and I got after her about that and she said she took that out in a $600 bond. I didn't see it. I asked her about it and she said she had them up in the bank."

1919; and he says he continued to live with her while he knew she was stealing over $6,000 from his "hiding places"!! The Chancellor rejected Mr. Umberger's story; and we do likewise. The entries in his "book" are self-serving and of no probative value. From the evidence it is shown that Mr. Umberger was having "women troubles"—as one witness expressed it. It therefore seems plausible that he and Mrs. Umberger divided the money from time to time and that she placed her part in the safety deposit box. What he did with his part is not known, since his present worth is not disclosed. At all events, we conclude that he acquiesced in all that Mrs. Umberger did in claiming as her own the currency found in her safety deposit box. We affirm so much of the decree as is adverse to Mr. Umberger regarding the currency.

The Chancery Court gave Mr. Umberger $840 of the currency in the safety deposit box. This was found in a paper sack. The evidence regarding the "paper sack money" is no different from the evidence regarding the other currency. Mr. Umberger's notation in his "book" said this:

"5-7-1944—put in wardrobe papper sack—with handchief pind up—840—all in 20 but 2—10—"

He admitted that he discussed the disappearance of this money with his wife:

"Q. Did you ever report that?

"A. I asked her about it. She admitted sometimes that she'd take it and sometimes I couldn't get anything out of her."

We reverse so much of the Chancery decree as awarded the $840 to Mr. Umberger, and hold it to be a part of Mrs. Umberger's estate.

III. *Undelivered Gifts of Money.* In Mrs. Umberger's safety deposit box there were several envelopes, each containing money and each envelope having some name or names on it. Illustratively we describe two:

(a)—An envelope had written on it, "For Gene Giles, Aubrey Sitz, Marilyn and Mary Ann Westmoreland," and contained $1,040 in currency.

(b)—An envelope had written on it, "This is for Mary Ann Westmoreland," and contained $540 in currency, as well as other matters.

The Chancery Court decreed that each such envelope or package constituted a complete gift of the contents to the person or persons named on the envelope, even though Mrs. Umberger was the only person who had access to the safety deposit box. There was no completed gift. In *Carter* v. *Greenway,* 152 Ark. 339, 238 S. W. 65, Mr. Justice HART quoted the law:

" ' . . . To consummate a gift, whether *inter vivos* or *causa mortis,* the property must be actually delivered, and the donor must surrender the possession and dominion thereof to the donee . . . ' "

The case at bar, on this point, is ruled by that case as well as by *Neal* v. *Neal,* 194 Ark. 226, 106 S. W. 2d 595, and *Stifft* v. *W. B. Worthen Co.,* 176 Ark. 585, 3 S. W. 2d 316. See, also, *Myers* v. *Hardin,* 208 Ark. 505, 186 S. W. 2d 925, in which we held envelopes, similarly marked and found in the deceased's safety deposit box, to be undelivered gifts. We reverse the portion of the decree which held the gifts to be completed, and we hold that the contents of the envelopes belong to the estate of Mrs. Umberger.

IV. *United States Government "Co-owner" Bonds.* In Mrs. Umberger's safety deposit box there were nine United States Government bonds totaling $2,200, each of which was a "co-owner" bond, in that it listed as payee Mrs. Umberger and some other named person. We hold that each of these nine co-owner bonds belongs to the survivor named as co-payee. In *Myers* v. *Hardin,* 208 Ark. 505, 186 S. W. 2d 925, we had occasion to consider United States Government bonds, wherein the payee was "Mrs. Cecilia Hickey, payable on death to," a named person. In that case we held that, under the United States Treasury regulations, each bond, on the death of Mrs. Hickey, belonged to the named person. The nine United States bonds in this case were "co-owner" bonds, issued under the same Treasury regulation as involved in the case of *Myers* v. *Hardin, supra*; and, as between

Mrs. Umberger's estate and the named co-owner, each bond belongs to such named co-owner.[5] Mrs. Umberger's estate is entitled to the postal savings account and all the other bonds, except the nine co-owner bonds.

V. *Necessity of Making Timely Objection in the Trial Court to Incompetent Evidence in Order to Raise the Question on Appeal.* What we have heretofore said disposes of the issues of this case; but we have unanimously decided that now is the time to call attention of the Bench and Bar to the matter stated in this topic heading. It will be observed that we have, in some instances, quoted Mr. Umberger's testimony as to conversations with Mrs. Umberger. Of course, such testimony—insofar as it was directed against the estate of Mrs. Umberger—was inadmissible as violative of § 2 of the Schedule to our Constitution which reads:

" . . . in actions by or against executors . . . in which judgment may be rendered for or against them, neither party shall be allowed to testify against the other as to any transactions with or statements of the testator . . . unless called to testify thereto by the opposite party."[6]

In the case at bar, appellee made timely objections in the trial court to all such incompetent evidence: so a statement by the Court at this time will not affect the results in the present case, but will apprise the Bench and Bar that we are clarifying the conflict that exists in our holdings on the point stated in this topic heading.

(A)—In law cases, the rule has always existed that failure to object to incompetent testimony when offered in the trial court, constituted a waiver of such objections. From *Gage* v. *Melton*, 1 Ark. 224, to *Sandidge* v. *Sandidge*, 212 Ark. 608, 206 S. W. 2d 755, and even later, this rule has been stated and followed in scores of cases. They may be found quoted in West's Arkansas Digest, "Appeal and Error," Key No. § 204.

[5] A recent case involving "co-owner" bonds is that of *Taylor* v. *Schlotfelt*, *ante*, p. 589, 237 S. W. 890.

[6] An article, entitled "The Dead Man's Statute in Arkansas," may be found in University of Arkansas Law School Bulletin, Vol. 9, No. 2, Page 63.

(B)—Originally, in probate cases, the same rule existed (see *Heaslet* v. *Spratlin*, 54 Ark. 185, 15 S. W. 461) ; because prior to Constitutional Amendment No. 24 (adopted in 1938) probate cases came to this Court on appeal from the *Circuit Court*.

(C)—It is in chancery cases that our holdings have shown lack of harmony regarding the necessity of making an objection in the trial court to alleged incompetent evidence. Then, when by the Constitutional Amendment No. 24 the Chancellor became the Judge of the Probate Court, the diverse holdings regarding chancery appeals were likewise applied to probate appeals.

In *Allen* v. *Ozark Land Co.*, 55 Ark. 549, 18 S. W. 1042, we were deciding a *chancery case* on appeal; and we held that the failure to register an objection, when incompetent evidence was offered in the trial court, constituted a waiver of such objection. Here is Mr. Justice BATTLE's language : 

''It is contended that the testimony of Cobbs as to the contents of the records in his office was not competent, because the records or certified copies thereof were the best evidence of their contents. This is true. But it does not appear in the record in this case that there was any objection to its admission as evidence. Appellant had the right to waive the production of the records or certified copies of the same, and accept proof of their contents, and did so by his silence. Failing to object, he, thereby lulled the appellee into repose and deprived it of the opportunity of offering better evidence. Had the testimony of Cobbs been incompetent for any purpose or on any condition, the circuit court should have given it no consideration, and in weighing the evidence should have excluded it on its own motion. In such cases the failure of a party to object does not add to the probative force of the incompetent testimony; but in case of secondary evidence, if he waives the conditions on which its admissibility depends, he thereby gives to it its full force as evidence. This is the rule in actions at law. *Frauenthal* v. *Bridgeman*, 50 Ark. 348, 7 S. W. 388. The same rule prevails in actions in equity. 3 Greenleaf on Evi-

dence (14th Ed.), § 357; *Barraque* v. *Siter,* 9 Ark. 545. Having failed to object to Cobb's testimony below, appellant cannot object to it here. *Eden* v. *Earl of Bute,* 1 Brown's P. C., 465; 2 Daniell's Ch. Pl. and Pr. (4th Ed.), pp. 1504, 1127; 1 Barb., Ch. Pr. (2d Ed.), pp. 419, 386.''

The case of *Allen* v. *Ozark Land Co., supra,* has never been expressly overruled on the point above quoted but a *rival* line of cases has grown up, holding exactly to the contrary. In *Cox* v. *Smith,* 99 Ark. 218, 138 S. W. 978, parol evidence was allowed in the trial court to defeat a written contract. No objection was offered to such parol evidence in the trial court. Nevertheless, this Court held that the parol testimony was incompetent and refused to give it any consideration on appeal, although it was not objected to in the trial court. We there said:

''It is urged by counsel for defendant that objection to the introduction of this parol testimony was not made by the plaintiff in the lower court, and on this account should not be considered here. But chancery cases are tried upon appeal *de novo.* It is presumed that the chancellor heard the case only upon evidence that was competent and relevant to the issues made. Upon appeal in chancery cases errors which relate to rulings upon the introduction of evidence will not be passed upon; but in the trial of such chancery cases upon appeal any evidence that was improperly excluded below will be considered, and evidence that was improperly received will be disregarded, and the case will be decided here solely upon competent evidence. *Niagara Fire Ins. Co.* v. *Boon,* 76 Ark. 153, 88 S. W. 915; *Latham* v. *First Nat. Bank of Ft. Smith,* 92 Ark. 315, 122 S. W. 992.''

The rule stated in *Cox* v. *Smith, supra,* has been extended and cited in frequent cases, whereas the rule stated in *Allen* v. *Ozark Land Co., supra,* has remained as the original—and correct—holding. In *Campbell* v. *Hammond,* 203 Ark. 130, 156 S. W. 2d 75, the majority followed the rule of *Cox* v. *Smith,* using this language:

''We, therefore, hold that appeals from the probate court are tried *de novo,* just as in chancery appeals, and

that this court will consider only the competent evidence in the record, whether formally objected to or not."

But to *Campbell v. Hammond*, Mr. Justice FRANK G. SMITH wrote a concurring opinion in which, in his usual careful manner, he reviewed the cases and authorities generally, and said:

"I perceive no reason why if the incompetency of a witness may be waived in a law case, the incompetency may not also be waived in an equity case. The text writers on evidence make no such distinction. If the incompetency of a witness is waived—and it is waived when the witness is permitted to testify without objection —then his testimony is competent, and may not be disregarded when the case reaches this court on appeal. . . . If the competency of a witness is waived, it is waived, as well in a chancery case, as in a case at law, and the rule adopted by the majority is not in harmony with our previous decisions, and is not conducive to the administration of justice."

Even though subsequent cases have followed *Campbell v. Hammond*,[7] nevertheless, after careful study we are convinced that the rule of *Allen v. Ozark Land Co.*— rather than that of *Campbell v. Hammond*—is the correct one. It is much fairer to litigants, as well as to trial judges in probate and equity cases, that they should know, when the case is decided in the trial court, what evidence is to be considered on appeal. Unless a timely objection be made by the litigants in the trial court, then the trial judge can be trapped into deciding a case on evidence that may later be held inadmissible, when objected to for the first time on appeal. This situation cannot result under the rule of *Allen v. Ozark*, whereas it has frequently come about under the rule of *Cox v. Smith* and *Campbell v. Hammond*. Therefore, we unanimously hold that in cases hereafter tried, all objections to evidence and witnesses must be made in a timely manner in the trial court, and if not so made, such objections will be considered as waived when the case reaches us on appeal. In other words, the rule stated in *Allen v. Ozark*,

---

[7] One such case is *Smart v. Owen*, 208 Ark. 662, 187 S. W. 2d 312.

and all the time existing in law cases, will be our rule in chancery cases and probate cases.