CARLSON, ADMINISTRATOR *v.* CARLSON.

5-537                                        273 S. W. 2d 542

Opinion delivered November 29, 1954.

[Rehearing denied January 10, 1955.]

*W. J. Dungan,* for appellant.

*Kaneaster Hodges* and *Max Owen Bowie,* for appellee.

GRIFFIN SMITH, Chief Justice.    Roy E. Carlson, Sr., died of cancer February 27, 1945.    He was the apparent owner of a half-ton Chevrolet truck that is the subject-matter of this appeal.

Roy E. Carlson, Jr., was appointed administrator of his father's estate.    In his inventory the truck was listed as an asset.    On March 17th the probate court directed that all personal property be sold.    The decedent's widow (a second wife and not Roy Junior's mother) petitioned

for exclusion of the truck from the court's order of sale, asserting that her husband had given it to her. There were circumstances indicating a contrary status, but from the testimony of numerous witnesses the court found in Mrs. Carlson's favor. A temporary order permitting Mrs. Carlson to use the truck was made March 17th. This was followed by an order of April 9th in Mrs. Carlson's behalf.

The appellant questions (a) sufficiency of the evidence and urges the inadmissibility of some of it; (b) the court's power to determine that Mrs. Carlson owned the truck, and (c) appellant insists that the court's refusal to reopen the hearing for new testimony was an abuse of discretion.

While there is substance to appellant's contention respecting the chancellor's appraisement of the testimony, it can hardly be said that the widow's position does not outweigh the administrator's claim. A kindred case is *Cowan* v. *Powell*, 219 Ark. 498, 243 S. W. 2d 373. There the decedent's wife thought a Buick car that was listed with her dead husband's assets had been the subject of a gift *inter vivos*. Witnesses who testified were about equally divided regarding statements Cowan had made. To some he had said that the Buick was his wife's car; others testified he had referred to it as his own. In reversing the chancellor's determination that Cowan gave the car to his wife it was held that in the absence of any proof whatever of conduct amounting to a gift "we are not willing to say that a claimant may overcome unimpeached written evidence of the decedent's ownership by simply voicing a conclusion of law, 'It is mine.' "

The Carlsons lived in McCrory, but engaged in farming operations several miles away. The truck was used for domestic and farming operations. It was purchased in mid 1953 when an old truck was turned in as part payment.

J. D. Forth, GMC dealer at McCrory, testified that while he was visiting in a home adjoining the Carlson residence Carlson drove up in a 1951 half-ton truck.

Forth asked Carlson if he would trade it for a new one, and the reply was, "No, this isn't my truck. It's [Mrs. Carlson's]. She drives the small truck and I drive the big one." Forth had seen Carlson driving the small truck, but "only a very few times. I would not say that he drove it when he went about his business on the farm: he used that big truck most of the time—like he told me in the house that evening. . . . I don't know too much about the new truck, only his wife drove it most of the time. . . . Mr. and Mrs. Carlson both worked, and worked hard. . . . It wasn't unusual for Mr. Carlson to buy this new truck rather than a car for his wife. Lots of people have a pickup truck."

Mrs. I. O. Holder testified that Carlson always referred to the 1953 truck as belonging to his wife. "I was in and out [of their home] and he asked me if I had noticed [Mrs. Carlson's] new truck. . . . He would come in driving the big truck; and, if he wanted to go to town, or Augusta, he would ask [his wife] whether she was going to use the [small] truck during the afternoon. He always asked her whether she intended to use it. Mrs. Carlson drove the truck every day."

Mrs. Zula Bends, a neighbor, observing that the Carlsons had a new truck, said, "I see you have a new truck," and he replied, "No, that is [my wife's]."

In 1952 Carlson had dinner at Mrs. Pearl Hancock's home southeast of McCrory and he said he had given the old truck to his wife. "The only thing I know about the new truck is that they got it and she used it." She thought Mrs. Carlson used the old truck 90% of the time. There was other testimony of a similar nature.

Against this evidence of an understanding between husband and wife that the truck would be regarded as Mrs. Carlson's property is the fact of registration in the husband's name and certificate of title; the additional circumstance that Mrs. Carlson assessed taxes for her husband. On January 28th, 1953, she listed the truck with his property.

It was shown that Mr. and Mrs. Carlson had a joint bank account, but his was not established until January, 1954, prior to the husband's death February 27th. Mr. Carlson was brought to Little Rock for hospitalization, where blood transfusions were required, and Mrs. Carlson remained with him and arranged for the necessary funds.

While it is alleged in the petition that Mrs. Carlson became owner of the 1953 truck "on or about the 17th day of July, 1953," we doubt that the evidence points with certainty to any particular date that might be looked upon as the consummation of a gift *inter vivos*. Rather, the relationship of husband and wife points with more certainty to a general understanding involving the 1951 truck and the husband's recognition of his wife's necessities and rights in respect of property essential to their mutual welfare. Not to be overlooked is the general tendency of friends and neighbors to carve out of incidental conversations words and conduct favorable to one who may be the object of their sympathetic solicitude, hence great care should be taken in a case of this kind not to over-appraise casual comments.

But in the case here we think Carlson's statements, repeated in different form over a protracted period, and invariably directed to the same idea, were more than casual or incidental. Seemingly the will to give was clear—sufficiently definite to mean a relinquishment of any personal claim. There was no mental reservation that some other act had to be performed before his own property right became extinguished.

Of course it is to be doubted that Carlson ever thought along a reasoned line where possessory rights upon the one hand and particular acts of relinquishment upon the other were rationalized; but the evidence is convincing that in dealing with the truck Mrs. Carlson's interests and convenience were of first consideration.

It is universally recognized that elements necessary to constitute a valid gift are three-fold: Intent by the donor to give; delivery, actual or symbolic to such an ex-

tent that the former owner is without power to recall, and acceptance by the donee. Acceptance may be implied, but the intention of the giver is essential, though express words or particular conduct may be dispensed with when reasonable minds would conclude from attending circumstances that the purpose was present. The decisive factor is whether the supposed giver has power to reclaim the property.

It seems certain that the chancellor believed the witnesses who testified to the many expressions by Carlson as to intent. He told GMC's agent Forth, in effect, that he could not trade in the 1951 Chevrolet because it wasn't his—that it belonged to his wife. Others were informed that the new truck was Mrs. Carlson's. We conclude, therefore, that the evidence was sufficient to sustain the gift.

There is a contention that much of the testimony should be disregarded because in contravention of Schedule 2 of the Constitution: "In actions by or against executors, administrators or guardians in which judgment may be rendered for or against them, neither party shall be allowed to testify against the other as to transactions with or statements of the testator, intestate or ward, unless called to testify by the opposite party." See *Campbell, Administrator,* v. *Hammond,* 203 Ark. 130, 156 S. W. 2d 75; *Allen* v. *Ozark Land Co.,* 55 Ark. 549, 18 S. W. 1042.

In *Umberger* v. *Westmoreland,* 218 Ark. 632, 238 S. W. 2d 495, decided in 1951, it was said that in cases tried subsequent to publication of the opinion all objections to evidence and witnesses not made in a timely manner during trial would be treated as having been waived. "In other words," said the court, "the rule stated in *Allen* v. *Ozark,* and all the time existing in law cases, will be our rule in chancery and probate cases."

The only objection was to a question asked of Mrs. Carlson by appellant's counsel. This occurred on cross-examination, and the question was not answered.

As to the contention that the probate court was without authority to vest title to the car in Mrs. Carlson, the answer in so far as this controversy is affected is to be found in *Thomas* v. *Thomas,* 150 Ark. 43, 233 S. W. 808, where Mr. Justice HART said in a unanimous opinion that the probate court, in the exercise of its jurisdiction to administer the estates of decedents, is authorized to determine what property belongs to the estate. See *Ellsworth, Administrator,* v. *Cornes,* 204 Ark. 756, 165 S. W. 2d 57.

A final contention is that Carlson executed to the Bank of McCrory Aug. 8th, 1953, a chattel mortgage on the truck to secure a loan of $725. The mortgage was filed but not recorded, hence appellant says he had no way of ascertaining its existence. With this additional evidence appellant thinks the court's decision might have been different. This mortgage was before the court when the motion was filed and its purport must have been considered, hence it appears highly probable that the probative value of the mortgage was treated as negligible. It is not improbable that Mrs. Carlson permitted her husband to mortgage the truck, or that he assumed such consent and executed the document without Mrs. Carlson's knowledge. In any event we are unwilling to say that the court abused its discretion in overruling the motion.

Affirmed.

Justices MILLWEE and GEORGE ROSE SMITH dissent.