STATE *v.* SNOW.

5-1859                                                324 S. W. 2d 532

Opinion delivered June 1, 1959.

*Bruce Bennett, Atty. General; Rose, Meek, House Barron & Nash,* for appellant.

*Mark E. Woolsey,* for appellee.

ED. F. McFADDIN, Associate Justice. This appeal stems from a proceeding in the Franklin Probate Court, brought on the relation of the State of Arkansas against appellee, W. F. Snow, under the provisions of Act No. 161 of the Arkansas Legislature of 1955. The effort was to have Appellee Snow committed to the Arkansas Tuberculosis Sanatorium, since the claim was made that he had tuberculosis in an active and communicable stage, was unwilling to voluntarily submit to medical treatment, and was living in environmental conditions that made appellee a source of danger to others.

The proceeding was instituted on June 5, 1958; the first hearing was on September 4, 1958; the second hearing was on November 10, 1958; and the Court's judgment, entered on December 5, 1958, contained these findings:

"That the petitioner has failed to show by sufficient and competent evidence that the respondent has tuberculosis in a communicable or infectious stage; has failed to establish by sufficient and competent evidence that the circumstances are not suitable for proper isolation or contagious control; has failed to establish by sufficient and competent evidence that the respondent is a source of danger to others and has failed to establish by sufficient and competent evidence that respondent should be committed to the sanatorium."

The State has appealed. In Probate cases, as is this, appeals are tested in the same way Chancery appeals are tested: that is, we examine the evidence to see if the findings of the Probate Judge are against the preponderance of the evidence. *Campbell* v. *Hammond,* 203 Ark. 130, 156 S. W. 2d 75; *Umberger* v. *Westmoreland,* 218 Ark. 632, 238 S. W. 2d 495; and *Credit Industrial Co.* v. *Blankenship,* 230 Ark. 371, 323 S. W. 2d 198 (opinion of April 13, 1959). After a careful review, we reach the conclusion that the Probate judgment must be affirmed, since we cannot say that the findings are contrary to the preponderance of the evidence; but the effect of the affirmance will be limited, as hereinafter set forth.

748

This being the first case before us involving the Act No. 161, we think it not amiss to discuss the Act for future guidance.[1] The caption of the Act No. 161 is: "An Act to Require Isolation of Recalcitrant tuberculous Patients; Prescribing Methods and Procedures Therefor; and for Other Purposes". Section 1 of the Act defines the words, "active tuberculosis"; Sections 2 and 3 relate to the investigations to be made by the proper persons preliminary to invoking probate jurisdiction; Section 4 states the allegations to be made in the petition; Section 5 authorizes the court to fix the hearing and cause notice to be served and provides for intermediate quarantine; Sections 6 and 7 relate to the probate hearing and the matters to be proved before the Court shall order the commitment of said person to a hospital or sanatorium; Sections 8, 9, and 10 relate to the matters after the commitment to the institution; Section 11 provides punishment for failure to observe the rules and regulations of the institution; Sections 12 and 13 are in regard to release from the institution; Section 14 provides a penalty for violation of the Act; and Section 15 is the general repealing section.

A proceeding under this Act for the ascertainment of the status, and the adjudication as to commitment, of a tubercular person is, in some respects, similar to an inquest regarding insanity, but the analogy must not be carried too far. Like an insanity proceeding, this is neither a civil nor a criminal proceeding, but rather is a special proceeding by the State in its character of *parens patriae*, based on the theory that the public has an interest to be protected. This is not a penal statute, yet it is to be strictly construed to protect the rights of the citizen.

---

[1] Our research reveals that the Act No. 161 of 1955 is not an exact copy of the act of any other State, but does bear a similarity to acts of some other States. We mention only four: Oklahoma Act of 1955, page 361, as found in Title 63 § 533 of Oklahoma Statutes Annotated; Pennsylvania Act of April 23, 1956, as found in Title 35 § 521.1 of Purdon's Statutes of Pennsylvania; Tennessee Act of 1953, Chapter 166, as found in § 53-1010 of the Tennessee Code Annotated; and Connecticut Act of 1955 S2124d and Public Act of 1957 No. 586 S16, both as found in § 19-120 of the 1958 Revision of the General Statutes of Connecticut. Our Act No. 161 of 1955 was amended by Act No. 298 of 1957 to add the City Health Officer in § 2 of the 1955 Act.

With this brief review of the Act before us, we revert to the case at bar.[2]  Section 1 of the Act says that "active tuberculosis" means ". . . that the disease is in a communicable or infectious stage as established by chest x-ray, microscopical examination of sputum, *or* other diagnostic procedures approved jointly by the State Health Officer and the Medical Director of either the Arkansas Tuberculosis Sanatorium, McRae Memorial Sanatorium or Arkansas State Hospital". (Emphasis supplied.)  In the case at bar, there is no evidence that any ". . . diagnostic procedures approved jointly . . ." have ever been made.  Turning next to chest x-rays, the answer is that no x-rays were introduced.  Finally, if we consider sputum tests, the answer is that no witness testified to having taken sputum of the appellee and examined it.  There are in the record letters which purport to have attached to them reports made by the Veterans Administration concerning the condition of the appellee. One report, dated January 25, 1955, showed active pulmonary tuberculosis based on an examination of January 20, 1955; another report, dated June 25, 1956, showed the same condition based on an examination of April 19, 1956; another report, dated December 9, 1957, showed the same condition based on an examination of July 5, 1957; and the most recent report was dated April 16, 1958 showing the same condition and based on an examination of December 9, 1957.  But the trial of this case was in September and November, 1958; and we do not know what the appellee's condition was at that time. No witness was produced by either side who had personally examined the appellee.  There is in the record some evidence from which the Court might have found that the disease was in a communicable or infectious stage at the time of the hearing; but the record is very meager as to the circumstances at appellee's home in regard to proper isolation.  Because of the condition of the record, we cannot say that the findings of the Trial Court are against the preponderance of the evidence.

However, a reading of the entire record indicates the probability that appellee is a very sick person who

---

[2] The constitutionality of the Act is not raised in this case.

stubbornly refuses to allow treatment and is probably a source of danger to those around him. So the affirmance of this present case is without prejudice to the institution of another proceeding by the proper officials against Mr. Snow; and the affirmance of this case will not be *res judicata* against any further proceeding. The possibility of such a serious and dangerous situation is indicated by this record that we are issuing an immediate mandate in order that further proceedings may be taken in keeping with the procedure and views stated in this opinion.

Affirmed.

WARD and JOHNSON, JJ., concur.

HOLT and ROBINSON, JJ., dissent.

GEORGE ROSE SMITH, J., not participating.

PAUL WARD, Associate Justice, concurring.

I concur in the majority opinion for two reasons.

(a) As stated by the majority, the trial judge found: "That the petitioner has failed to show by sufficient and competent evidence that the respondent has tuberculosis in a communicable or infectious stage". I agree that the above statement is true, but it is my view that it was not necessary under the statute for the court to make such a finding. Even a casual reading of said Act 161 confirms my view. Section 1 defines tuberculosis in a "communicable or infectious stage" as it is established by a procedure approved jointly by the State Health Officer and the Medical Director of either the Arkansas Tuberculosis Sanatorium, the McRae Memorial Sanatorium, or the Arkansas State Hospital. To my mind it is unreasonable to think that a Probate Court would be expected to conduct an examination such as contemplated by the statute, or, if it were attempted, that the Probate Judge would not be capable of properly evaluating it. Section 2 and 3 of the statute make it plain that a petition may be filed in the Probate Court upon "reasonable grounds to believe" that a person has tuberculosis, and that, upon such showing, the Court takes jurisdiction. Section

7 of the statute shows plainly that there is only *one* issue to be decided by the Court. That issue is not, as the majority holds, whether the respondent has tuberculosis in a communicable form, but it is whether his surroundings are suitable "for proper isolation."

There is an important fundamental difference in my view and the view of the majority. Under my view the Tuberculosis Sanatorium would make the examination while under the majority view the Probate Judge would make it. I submit that the majority view is not sustained by the Statute, and, further, that it makes said Act 161 unworkable and useless, because the Court is not equipped to make a test of this nature.

(b) As stated before, the Probate Court's duty was to determine from the evidence whether the respondent was living in circumstances not suitable for isolation. I have read the record carefully and feel that it supports the trial court's finding that no such showing was made. It is upon that ground only that I would affirm.

Stating the matter briefly, Act 161 of 1955, provides: (a) if there is reasonable grounds to believe John Doe has active tuberculosis, and (b) if he refuses to be examined, then (c) the Probate Court is empowered to do one of two things. (d) If it finds John Doe is properly isolated he must be released, but (e) if the Court finds John Doe is not properly isolated he must be sent to the Sanatorium for examination and treatment.

JIM JOHNSON, Associate Justice, concurring.

I concur in the result reached in the majority opinion.

This was an action brought in the name of the Franklin County Health Officer under the provisions of Act No. 161 of 1955, seeking an order of the Franklin County Probate Court to commit appellee, William Fred Snow, to the Arkansas Tuberculosis Sanatorium alleging that appellee has tuberculosis in an active and communicable form, that he will not voluntarily seek medical treatment, that the environmental conditions and conduct

of appellee are not suitable for proper isolation or contagious control by any type of local quarantine, and that he is a source of danger to others.

After all the evidence had been presented at the hearing, the trial court found that appellant failed to establish grounds for committing the appellee and discharged him.

From such findings comes this appeal. Appellant urged three points for reversal. For the reasons hereinafter set forth, I reach none of the points raised by appellant.

Sections 2 and 3 of Act 161 of 1955[1] are as follows:

"Section 2. When the *state* or any *county*[2] health officer shall have reasonable grounds to believe that any person has tuberculosis in active state or in a communicable form, and who will not voluntarily seek a medical examination or treatment, then it shall be the duty of said health officer to make an investigation of such person to determine whether the environmental conditions of the person, or the conduct of the person, is suitable for proper isolation, or contagious control of the case by any type of local quarantine.

"Section 3. If the *health officer* finds that the circumstances are not suitable for proper isolation of contagious control of the case by any type of local quarantine, and said person will not voluntarily seek medical treatment and is a source of danger to others, he shall petition the Probate Court of the county where said person is found, to order the admission of the person to any state owned and operated tuberculosis hospital or sanatorium." (Emphasis supplied.)

---

[1] Our research reveals that Act 161 of 1955 was not adopted from any one state but instead was the result of a study of the acts of a number of states, viz: Ky., Tenn., Conn., Penn., Okla., Ariz., Calif., Fla., Ga., Idaho, Ind., Iowa, Maryland, Mich., Minn., Nev., N. J., N. C., N. Dak., Ohio, S. C., S. Dak., Alaska, and Hawaii.

[2] This Act was amended by Act 298 of 1957 to include the words *"or city"* following the word county and preceding the word health in the first line of Section 2.

This action was brought by Mrs. Onoto P. McCann, Public Health Nurse of Franklin County. Mrs. McCann testified that she was "in the Public Health Service, under the Arkansas Board of Health, part-time Health Officer for Dr. Stacey Long who is the Health Officer of Franklin County." Ark. Stats. Cum. Suppl. 82-201, provides: ". . . the State Board of Health, with the approval of the County Judge, shall appoint for each county in this State *a* health officer, who shall serve for a term of two years. *The* county health officer shall be a graduate of a reputable medical college, and shall have had at least three years' experience in the practice of medicine in this State;" (Emphasis supplied). There is no provision in the statutes for a "part-time" county health officer, hence it must be concluded from Mrs. McCann's own testimony that Dr. Stacey Long is *the* County Health Officer. Dr. Long did not testify in the case and according to the record he had absolutely nothing to do with the matter. Therefore, since neither the state, county or city health officer brought this action as required by the Act, it is my view that we should continue to follow the well established rule that a statute should be construed so that no clause, sentence or word shall be void, superfluous or insignificant. *Wilson* v. *Biscoe,* 11 Ark. 44. The effect of this statute will be to deprive the appellee of his liberty against his will and therefore should be construed strictly in favor of the appellee. The fact that this is a public health measure is no excuse for abandoning the safeguards and the constitutional liberties enjoyed by this appellee without requiring strict compliance with the terms of the statute and with the rules of evidence as in other cases where a person's liberty is involved. Therefore, for the reasons stated, I concur.

SAM ROBINSON, Associate Justice, dissenting. The appellee, Snow, is left free to go his way with wanton disregard of the fact that perhaps he is giving the dreaded disease of tuberculosis to others. The majority say: "There is in the record some evidence from which the court might have found that the disease was in a communicable or infectious stage at the time of the hear-

ing; but the record is very meager as to the circumstances at appellee's home in regard to proper isolation. Because of the condition of the record we cannot say that the findings of the trial court are against the preponderance of the evidence." The majority fail to mention that the State cannot force this man to submit to an examination unless he is sent to the State Tuberculosis Sanatarium.

In my opinion the overwhelming weight of the evidence is that Snow has tuberculosis in a communicable form and that conditions at his home are not suitable for isolation. In fact, there is no substantial evidence to the contrary.

In response to the State's petition that he be sent to the Tuberculosis Sanatarium, Snow denied that he has tuberculosis in a communicable form and he further stated in his response that he "desires to have himself examined by a competent physician, or physicians, of his own choice to determine this question [if he has tuberculosis in a communicable form] and if such examination should show that he does have tuberculosis in an active state or a communicable form, he will voluntarily seek medical treatment for such disease." The State's petition to have Snow sent to the Tuberculosis Sanatarium was filed on June 5, 1958. The above mentioned response was not filed until three months later. During this three month period Snow apparently made no effort to have himself examined. When the original petition was filed on June 5th notice was given that a hearing would be held on June 16th. At that time Snow had filed no response, and no hearing was held. On August 28th another notice was served that the hearing would be held on September 4th. On that day, September 4th, Snow for the first time filed a response. He did not deny that he has tuberculosis, but alleged that it is not in a communicable form and although he stated he wanted to be examined by a doctor of his own choice, he gave no explanation of why he had not submitted to an examination during the three months that had expired since the State's petition was

filed on June 5th. In his response filed on September 4th he sought further delay by asking that he be granted a continuance in order that he might have made the examination. Although the State's evidence was taken on September 4th, Snow was granted a continuance to have himself examined, and the case was reset for October 8, 1958. On that day the case was again continued at his request. Finally, on November 10th, when Snow produced his evidence, he testified that he went to a Dr. Russell at Jasper, Arkansas, in Newton County, for the examination. Dr. Russell was not called as a witness, nor was any report from him put in evidence. But apparently Snow had some kind of a report from the doctor, because the trial court commented as follows: "Now, this is not a very good report. I mean as far as court proceedings are concerned. This 'heart and lungs negative to P and A'—I don't know what that means." Neither does this Court know what it means. Snow does not live very far from the State Tuberculosis Sanatarium at Booneville. It is a matter of common knowledge that it is one of the finest institutions of its kind in the world, and yet Snow did not go there for an examination, and he gives no reason for not going there to be examined. Perhaps he felt that the doctors at that institution would report that he has an active case of tuberculosis.

Dr. Dorothy Cody, M.D., is a graduate of Duke University School of Medicine and served an internship and residency at the University Hospital in Little Rock. She is a director of the Division of Tuberculosis, State Health Department, and has been in that work since July, 1955. She caused the proceedings to be filed, attempting to get Snow into the Tuberculosis Sanatorium, so that he would not endanger the lives of others. She testified that tuberculosis is a very communicable disease. She was asked:

"Q. . . . You do not know of your own knowledge, based on any examination that you made yourself, whether the defendant has tuberculosis or not, do you?

A. To that I would like to say yes, Your Honor.

THE COURT: Explain your answer.

A. . . . the sputum provided by Mr. Snow and examined showed tuberculous bacilli, which is found to be positive. This is evidence he has tuberculosis and I know this of my own knowledge.''

The witness testified that she was only stating what she knew herself. She testified that she personally had seen an examination of sputum which Snow is purported to have furnished. Snow did not deny that he had furnished such a specimen of sputum.

Snow testified that he is being paid 100% disability by the Veterans Administration because of having tuberculosis. He testified that he has had hemorrhages from the lungs and had coughed up ''a mass of horny tissue, larger than a hen egg. . . . with corruption''. There are several reports in the record made by doctors at the Veterans Administration to the effect that Snow has tuberculosis in a communicable stage; that he is a hazard to other people and should be hospitalized. But considering that these reports may not have come into the record according to the strict rules of evidence, nevertheless there is overwhelming competent evidence that Snow has tuberculosis in a communicable form.

Mrs. Onoto McCann, public health nurse, testified in the case, and a report that she had made was introduced in evidence as an exhibit. She was not cross-examined on this report. It states that Snow has a far advanced active case of tuberculosis; that the sputum status was positive; that he lived in a four room house with four beds; that his wife and a son lived there; that the situation was not such that he could have a room of his own; that the water supply was from a well and there were no facilities for sewage disposal; that there was a milk can sitting at the gate when she went into the house, but it apparently was picked up during her visit, because it was gone when she came out—indicating that the Snow family sells milk; that there were two preschool grandchildren visiting in the home. The situation is pretty

well explained by a letter dated June 13, 1958, written by Mrs. McCann to Dr. E. J. Easley of the Arkansas State Board of Health. A copy of this letter was made an exhibit and Mrs. McCann was not cross-examined in regard to it. This letter is as follows:

"...

"As I drove into the yard of Mr. Wm. Fred Snow, Mr. Wm. Fred Snow and two men were standing on the driveway talking and three cars were parked around the house. Mr. Snow sent the men with him into the field to work before he came to greet me and invited me into the home. His wife, his son, Wayne, Wayne's wife and two preschool children were sitting at the table eating. The son, Harold, who is a household contact, and the patient's wife joined Mr. Snow and me in the living room. After about an hour and a half of letting the patient talk freely, and my tuberculosis health education teaching, the patient and his son, Harold, were giving some consideration of running three 3-day sputum test and being hospitalized in VAH, at least, until his sputum was not positive, but he was still contending that his religion would not let him take medicine or any type of treatment.

"At this point, the married daughter, Mrs. Pauline Wyers, (who works in the Bank of Ozark) who had not previously been in the room during the discussion, ordered me to leave the home immediately, and to attend to my own business, and not to do any snooping around when I got back to Ozark. At the same time, the son, Wayne, from California, walked in and picked up a double-barrelled shot-gun, which was behind a curtain, and held it on me until I left the room and the premises in my car.

"As I went out the door Mr. and Mrs. Snow and Harold apologized for Pauline and Wayne's actions, and they asked me to leave the sputum containers, as they might be used.

"I also observed a large milk can at the front gate as I went in and during my visit some one picked it up.

"Yours sincerely,
"(Mrs.) Onoto P. McCann,
Public Health Nurse"

The record in this case convinces me beyond a shadow of a doubt that Mr. Snow has active tuberculosis in a communicable form; that the facilities at his home are not such that he can be properly isolated; that he will not voluntarily cooperate with the health authorities; and that he should be sent to the Tuberculosis Sanatarium, to keep the public from being exposed to tuberculosis germs that undoubtedly are being spread about from this active case of tuberculosis. For these reasons I respectfully dissent.

MR. JUSTICE HOLT joins in this dissent.