AMERICAN ALLIANCE INSURANCE COMPANY *v.* PAUL.

Opinion delivered May 2, 1927.

1. REFORMATION OF INSTRUMENTS—MUTUAL MISTAKE.—To entitle a party to reform an instrument in writing, it must be shown that the mistake was common to both parties, and that the instrument as delivered did not express the contract as understood by either.

2. REFORMATION OF INSTRUMENTS—SUFFICIENCY OF PROOF.—While equity will reform a written instrument on account of a mutual mistake, if it does not reflect the intention of either party, yet the proof of such mistake must be clear, unequivocal and decisive, but the rule does not require that the proof be undisputed.

3. INSURANCE—REFORMATION OF POLICY.—Where insurer and insured intended a fire policy to cover cotton while in the possession of a warehouse company, but the policy required storage in a certain warehouse, the insurance agent not knowing that the warehouse company had acquired another warehouse, the policy was

properly reformed, after loss of the cotton in such other ware-
house, to cover it while stored there, since such limitation of cover-
age, under the circumstances, amounted to inequitable conduct
justifying reformation.

4. INSURANCE—REFORMATION OF INSTRUMENT.—A policy of fire
   insurance, like any other written instrument, is subject to
   reformation, where the facts and circumstances will justify, so
   as to express the real intention of the parties.

5. INSURANCE—PENALTY AND ATTORNEY'S FEES.—In a suit to reform
   a fire insurance policy by changing the description of location
   of the property insured, and for value of which the insured
   property was destroyed, it was error to assess the statutory
   penalty and attorney's fee, where plaintiff made demand for the
   full value of the property destroyed without payment or tender
   of premiums due.

6. INSURANCE—DEDUCTION OF UNPAID PREMIUMS.—In a suit for
   reformation of a fire insurance policy and for the value of insured
   property which had been destroyed, the amount of unpaid pre-
   miums should be deducted from the judgment, which was for the
   value of the property destroyed plus interest.

Appeal from Jefferson Chancery Court; *Harvey R.
Lucas,* Chancellor; reversed in part.

*Cockrill & Armistead,* for appellant.

*Rowell & Alexander,* for appellee.

McHANEY, J.   On November 22, 1924, appellee, E. L.
Paul, was the owner of thirty-seven bales of cotton in
transit *via* Missouri Pacific Railroad Company from
Grady to Pine Bluff, Arkansas, shipper's order bill of
lading for twenty-seven bales of such cotton having been
issued and delivered to appellee, and the other ten bales
moving separately from H. A. Bankston to H. A. Banks-
ton, Pine Bluff, Arkansas, notify E. L. Paul, c/o Pine
Bluff Compress & Warehouse Company, Pine Bluff,
Arkansas.   On that date appellee went to the office of
the Home Insurance Agency in Pine Bluff to procure
insurance on this cotton, which he did through Mr.
George W. Wells, president of the agency company, who
caused to be issued a policy of insurance in appellant
company in the sum of $5,000 for a premium of $22.40
for a term of six months from November 22, 1924, to May
22, 1925, against loss by fire on the following described

property, "while located and contained as described herein, and not elsewhere, to wit:

"$5,000 on cotton in bales, owned or held by the assured, in trust, or on commission, or on joint account with the Pine Bluff Compress & Warehouse Company's Compress and Warehouse, and on platforms and tramways adjoining said compress, situated near the eastern city limits of Pine Bluff, Arkansas, and also while in or on cars on sidetracks and switches before actual delivery of cotton is made to the said compress, but not while in transit nor while bill of lading is in force. * * * It is further understood and agreed that, if this policy covers at more than one place or location (and within the meaning of this clause each warehouse, yard or platform is understood to be a separate location), then the whole amount of insurance named herein shall be distributed and apply in each location as the value of the property insured in each location bears to the total value of the property insured in all locations. * * *"

Prior to obtaining this insurance appellee had borrowed a sum of money from the National Bank of Arkansas, for which this cotton was security, and, by agreement of parties, a loss payable clause to the National Bank of Arkansas was attached to the policy and delivered to the National Bank of Arkansas by the agency, on the direction of appellee, Paul, who did not read and never saw the policy until after the loss hereinafter mentioned.

The Pine Bluff Compress & Warehouse Company had for many years owned and operated a very large compress and warehouse near the eastern city limits of Pine Bluff, which it called No. 3, and the St. Louis Compress Company had owned a cotton warehouse on the west side of the city, which, in September, 1924, it sold to the Pine Bluff Compress & Warehouse Company, and which was known as warehouse No. 1, but same had not been used by the latter company for the storage of cotton until the middle of November, and neither Mr. Paul nor Mr. Wells of the insurance agency knew, at the time this

policy was issued, that the Pine Bluff Compress & Warehouse Company either owned or was using for storage of cotton warehouse No. 1 in the western part of the city. In press or warehouse No. 3 there were two rates for insurance on cotton stored therein, depending on the location of the cotton in the compartments. There were twelve storage compartments in this press, and, if the policy was to cover while located in compartments from one to twelve, the premium rate is 64 cents, but if the location of the cotton is limited to compartments five to twelve, the premium rate is 39 cents per hundred dollars. The premium rate in warehouse No. 1 is $2.31 per hundred dollars, and if the policy covers cotton in both warehouses, in the nature of a blanket coverage, the premium rate is $2.81 per hundred dollars. At the time the policy was written, neither party having in mind the possibility of the location of the cotton in the warehouse No. 1, they discussed the difference in rates in warehouse No. 3, and Mr. Paul chose the higher rate in order that there might be no contention regarding the location of the cotton in the event of loss.

The twenty-seven bales covered by the bill of lading before mentioned were brought into Pine Bluff promptly, but were not unloaded in warehouse No 3 on account of congestion, and, by direction of the warehouse company, they were delivered to and stored in warehouse No. 1. Thereafter, on December 11, warehouse No. 1 was destroyed by fire, in which these twenty-seven bales were burned. The other ten bales were delivered to compress No. 3 in the eastern end of the city. Appellee did not discover, for some time after the fire, that his cotton had been destroyed, but he did later discover this fact, and, on December 31, 1924, he was in the office of the Home Insurance Agency and advised Mr. Wells that twenty-seven bales of his cotton were burned. Mr. Wells promised to notify the company of the loss, and stated that it would not be long before he would hear from them. On that day, December 31, after Mr. Paul had left the office, Mr. Wells wrote him a letter advising him

that, in his judgment, the company was not liable, for the reason that he had discovered, on examination, that the policy covered loss in press No. 3, and did not cover loss in press No. 1, and in this letter he made this statement:

"After you were in our office this A. M., and when we started to report loss to the company, we found that this policy was issued, upon your instructions, to cover in press No. 3, situated in the eastern part of Pine Bluff, at rate of 64 cents per annum. We mention rate, as there could be no doubt as to whether the policy should cover, for, at time you took out this policy, you had us give you tentative figures as to the cost of same. The rate in press No. 1, which burned, is $2.31 per $100."

After denying liability, he stated in the letter that they were reporting the loss to the company, advising it fully, and would let Mr. Paul hear from him again when he heard from the company. The agency thereafter, on the first of each month, rendered a bill to appellee, Paul, for the premium on this and other policies, and, on March 16, 1925, while in the office of the agency, he signed a check written out by Mr. Wells for $30.40, covering his bill for this and other premiums, and on that day, after Mr. Paul had left the office, Mr. Wells wrote a letter to him, returning the check for $30.40, and again denying liability under the policy in question, in which he stated:

"We could have and would have been just as pleased to write you insurance there (meaning in press No. 1) as in press No. 3, in fact, we would have liked it better, as rate in that location is higher, and, as we work upon a commission basis, our commission would have been greater."

Appellant having denied liability, appellees, E. L. Paul and the National Bank of Arkansas, brought suit in the Jefferson Chancery Court for a reformation of the policy, by changing the description of the location of the property insured from what it was as issued to read "while contained in any compress or warehouse belonging to the Pine Bluff Compress & Warehouse Company, in or adjacent to the city of Pine Bluff, Arkansas," and

for judgment for $3,000, the agreed value of the twenty-seven bales of cotton, interest, 12 per cent. damages, attorney's fees, and costs. The court, after hearing the evidence, decreed a reformation of the policy in accordance with the prayer of the complaint, gave judgment thereon for $3,000, and added the penalty and attorney's fees in the sum of $300, in which the court made a finding of fact to the effect that, quoting appellant's abstract, "there was a mutual mistake, that is, that there was a meeting of minds and an agreement actually entered into, but that the policy, in its typewritten form, does not express what was really intended by the parties." The court further found that the agent Wells and appellee, Paul, both understood the cotton was insured while in the custody of the warehouse company, and so intended it, and that, even if it could be said that that was not the intention of the agent, then his conduct was so inequitable as to justify reformation. "For either reason, this court finds the evidence clear, satisfactory and convincing that the intent of the parties was not correctly expressed in the typewritten portion of the policy, and the policy—that part of it where the mistake of the draftsman occurred in failing to give the correct location of the property—should be reformed." From the decree against it appellant has appealed to this court.

Appellant's first contention for a reversal is that the decree of reformation is not sustained by the evidence, for the reason, first, that, to entitle a party to reform an instrument in writing, it must be shown that the mistake was common to both parties, and that the instrument as delivered did not express the contract as understood by either, and that the evidence in this case is not sufficient to show this; and, second, that reformation of a written contract will be granted only where the proof is clear, unequivocal, decisive and beyond reasonable controversy, and that the evidence in this case does not measure up to this standard. As abstract propositions of law, both of the above declarations or statements of the law are correct. The substance of the first prop-

osition is taken from *Varner* v. *Turner,* 83 Ark. 131, 102 S. W. 1111; and in *Cherry* v. *Brizzolara,* 89 Ark. 309, 116 S. W. 668, 21 L. R. A. (N. S.) 508, both propositions are sustained. In the first case, quoting from the syllabus, it is said: "To entitle a party to reform a deed upon the ground of mistake it must be clearly shown that the mistake was common to both parties, and that the deed as executed does not express the contract as understood by either of them."

The second syllabus of the next case sustains the second proposition of law above stated as follows: "While equity will reform a written instrument on account of a mutual mistake if it does not reflect the intention of either party, yet the proof of such mistake must be clear, unequivocal and decisive."

Any number of decisions of this court might be cited, and a great number of them are cited and quoted from in appellant's brief, running from *McGuigan* v. *Gaines,* 71 Ark. 614, 77 S. W. 52, down to the recent case of *Norsworthy* v. *Hicks,* 170 Ark. 877, 281 S. W. 660. But we do not agree with counsel that these rules have not been met and satisfied in this case. Let it be remembered that neither the agent of appellant nor Mr. Paul knew that the compress company had more than one warehouse for the storage of cotton in the city of Pine Bluff; that appellee, Paul, knew nothing about the location of the one warehouse in the eastern part of the city. What Mr. Paul wanted, and what Mr. Wells intended necessarily, was that the cotton should be insured while in the possession of the compress company, wherever it might be located, and Mr. Wells believed that it would be located in warehouse No. 3, as that was the only place that it could be put and be in a warehouse in the possession of the compress company, as he knew of no other at that time. The fact that it might be located a part in one place and a part in another place is distinctly recognized by the second clause of the policy above quoted, although neither party actually contemplated such at the time. A portion of the language of that clause is, "that, if this policy covers at more than

one place or location (and within the meaning of this clause each warehouse, yard, or platform is understood to be a separate location)," and this is a recognition that the cotton might be in different locations.

While Mr. Wells testified very positively that he wrote the policy in accordance with the instructions of Mr. Paul, he says that, when Mr. Paul came into his office and asked him what it would cost to insure the thirty-seven bales, he asked him where the cotton would be, and that Mr. Paul said in the Pine Bluff Compress & Warehouse Company, showing conclusively, to our minds, that it was the intention of both parties that the cotton should be insured while in the possession of the Pine Bluff Compress & Warehouse Company, wherever it might be located. This conclusion is further borne out by the fact that, in the letter of December 31, 1924, he stated that the policy was issued on Mr. Paul's instructions to cover in press No. 3 "at rate of 64 cents per annum. We mention rate as there could be no doubt as to whether the policy should cover, for at time you took out this policy you had us give you tentative figures as to cost of same."

In other words, Mr. Wells bases his statement that Mr. Paul instructed him to insure this cotton in warehouse No. 3 on account of the rate charged. The fact that he charged him a 64-cent rate is the foundation for Mr. Wells' belief that Mr. Paul gave him such definite instructions, rather than an independent recollection that Mr. Paul had so instructed him. This letter was written December 31, shortly after the fire, and his recollection of the matter at that time was undoubtedly better than it was at the time of the trial. In his letter of March 16 Mr. Wells states that he would have been pleased to have written his insurance covering press No. 1. On December 31, Mr. Paul went to Mr. Wells' office and notified him that twenty-seven bales of his cotton had been destroyed in warehouse No. 1, and Mr. Wells at that time did not know, or at least did not remember, that the policy did not cover warehouse No. 1, and told Mr. Paul that

he would notify the insurance company and would hear
from them shortly. He did not know, or did not remember, that it was not covered until he looked at his records
and found that he had caused the policy to be written so
as to cover only in press No. 3. Again, it is not disputed
that Mr. Paul wanted his cotton insured and that Mr.
Wells agreed to insure it while in the possession of the
Pine Bluff Compress & Warehouse Company. Mr. Wells,
as agent of appellant, agreed and undertook to do this.
If therefore, having undertaken to protect Mr. Paul
against loss of this cotton by fire, while in the possession
of the warehouse company, he either carelessly, negligently or fraudulently so wrote the policy as to limit the
coverage to loss to a particular possession instead of possession generally, this would amount to inequitable conduct, such as to justify reformation of the policy.

In the case of *Welch* v. *Welch,* 132 Ark. 227, 200 S. W.
139, this court went thoroughly into the question of reformation of written instruments, and there held that a
court of equity will reform written instruments either
where there is a mutual mistake or where there has been a
mistake of one party accompanied by fraud or inequitable
conduct of the other party, and quoted Pomeroy, Eq. Jur.
(3 Ed.), vol. 4, par. 1376, as follows:

"Equity has jurisdiction to reform written instruments in but two well defined cases: (1) Where there is
a mutual mistake—that is, where there has been a meeting of minds—an agreement actually entered into, but
the contract, deed, settlement, or other instrument, in its
written form, does not express what was really intended
by the parties thereto; and (2) where there has been a
mistake of one party accompanied by fraud or other
inequitable conduct of the remaining parties. In such
cases the instrument may be made to conform to the
agreement or transaction entered into according to the
intention of the parties. The conditions of fact giving
rise to the exercise of the jurisdiction to grant reformation are numerous. Almost all written instruments may
be reformed when a proper occasion is furnished."

In order to justify reformation it is not necessary that the facts be undisputed. · In *Troupe* v. *Ancrum,* 146 Ark. 36, 225 S. W. 9, it is said, quoting from syllabus:

"While, to justify reformation of an instrument for mutual mistake, there must be something more than a mere preponderance of the evidence, the rule does not require that the proof be undisputed; it is sufficient if the testimony is unequivocal and clear, that is, such as to satisfy the court that the mistake was made and that the instrument does not express the intention of the parties."

A policy of fire insurance, like any other written instrument, is subject to reformation, where the facts and circumstances will justify, so as to express the real intention of the parties. *Conn. Fire Ins. Co.* v. *Wigginton,* 134 Ark. 152, 203 S. W. 844, where this court reformed a fire insurance policy so as to attach a standard mortgage clause to same instead of a loss-payable clause, and this was done on conflicting evidence.

It necessarily follows, from what we have said, that the decree of the court in reforming this policy to cover the loss of these twenty-seven bales of cotton is correct.

The last contention of counsel for appellant is that the court committed error in assessing a penalty and attorney's fee, and this contention is made on the ground that the penalty and attorney's fee statute applies only to a suit on a written policy, and that no recovery was had in this case on the written policy involved herein; that the policy was reformed by parol testimony and a recovery had on the policy thus reformed. We agree with counsel that the court erred in assessing penalty and attorney's fees, but for a .different reason from that alleged. The case of *Ætna Ins. Co.* v. *Short,* 124 Ark. 505, 187 S. W. 657, cited by counsel, is not authority to sustain appellants' contention on this ground. In that case no policy was issued. Here the policy was issued, but not written in accordance with the intention of the parties. We agree with the contention that there can be no recovery for attorney's fees and penalty, for the reason that appellees cannot recover the full amount sued for—the sum

demanded. *Pacific Mutual Life Ins. Co.* v. *Carter,* 92 Ark. 378, 123 S. W. 384, 124 S. W. 764. The premium on this policy has not been paid, and there was no offer on Mr. Paul's part to pay same during the course of this trial. Furthermore, the uncontradicted testimony shows that the rate in warehouse No. 1 is $2.31 per hundred dollars, whereas the rate in compartments from one to twelve in warehouse No. 3 was 64 cents. We cannot tell from the evidence in the record what the rate on warehouse No. 1 would be for six months, whether one-half of the annual rate or not. If we could so determine this matter, judgment would be entered here. The decree of the chancery court in this regard was erroneous, and in this respect it is reversed, with directions to determine the amount of the premium due for the six months' period on the twenty-seven bales of cotton in warehouse No. 1, of the value of $3,000, and the amount of the premium due and unpaid for the ten bales of cotton located in warehouse No. 3, and deduct the total thereof from the $3,000 and interest, as allowed in the decree, and enter judgment for the balance thus found to be due. It is so ordered.