ROBERT ARNETT AND BEATRICE ARNETT v. NANCY LILLARD

5-4708                                    436 S.W. 2d 106

Opinion Delivered January 13, 1969

*George K. Cracraft, Jr.* for appellants.

*David Solomon* for appellee.

JOHN A. FOGLEMAN, Justice.    Appellants are the daughter and son-in-law of appellee, the plaintiff in a suit to cancel a deed by which she had conveyed certain lands to them.    She alleged that the deed was made in order that appellants might arrange the refinancing of an indebtedness she had secured by a mortgage on the land, but that contrary to their agreement, appellants had refused to reconvey the lands.    This refusal, she contended, amounted to fraud.

Appellee Nancy Lillard owned 120 acres of land on which she had lived since 1918.    In 1964 it was subject to a mortgage indebtedness in excess of $8,000 bearing interest at the rate of 10% per annum on an original debt of $6,000.    Her payments were in arrears, making the debt subject to acceleration, but she was not being pressed for payment.    She was nearly 70 years of age and unable to farm the lands herself, so had rented them to a tenant for a year or more.    She also owed $1,000 on a tractor she had used on the farm.    Appellant Beatrice Arnett and one other daughter were the only ones of her nine living children who did not live in St. Louis.    Robert Arnett was living in the vicinity, farming rented lands.

The parties do not agree on the preliminaries to the refinancing arrangement leading to the conveyance of the lands.    Mr. Earl Wilson, the county supervisor of the Farmers Home Administration in Phillips County, testified that in October 1964, Nancy Lillard made an application to his agency for a loan.    She listed debts of $9,200 on her application.    She was not eligible for a loan because she did not operate the farm herself. This application was withdrawn.    Appellants then made application to the FHA on November 2, 1964, to purchase the farm and to refinance an indebtedness of $416.64 on

their home and the two acres of land on which it was situated. The application indicated that Robert Arnett would farm the land. On November 9, 1964, Nancy Lillard signed an option to appellants to purchase the land for $8,000. The FHA appraisal showed a normal, or loan value, of $8,600, but the loan actually made was $8,380. The objective of the appraisers was to arrive at a loan value amounting to about 70% of the market value. When the loan closing costs, land clearing costs, repair costs and the balance of the debt on the Arnett home had been paid, there remained $8,000 to pay on the mortgage on the land. The loan was closed on March 15, 1965, on which date Nancy Lillard conveyed the lands to the Arnetts by the warranty deed which she now seeks to cancel. The loan proceeds were not sufficient to pay the mortgage in full. On March 30, 1965, the FHA made a production loan of $3,000 to Robert Lillard, from which a $1,000 balance on this indebtedness was paid and the Lillard farm equipment was then transferred to him by a bill of sale signed by Nancy Lillard. The FHA mortgage loan was at 5% interest, payable in annual installments of $488 over a period of 40 years. All of the annual payments becoming due prior to the institution of this suit were made by Robert Arnett. Due to an illness suffered by him, he was granted permission by the FHA to rent the lands to a tenant in 1967. Mr. Wilson stated that Robert Arnett was present on one occasion when Nancy Lillard's application was discussed. Although Mr. Wilson understood from conversation among the parties that appellee "would live out her days" in her home on the lands, no collateral agreement between the parties to the deed came to his attention. Nancy Lillard did continue to live on in her home and was living there at the time of the trial.

Nancy Lillard had a sixth-grade education and could read and write, but said that she could not now see well enough to read. She testified that she understood when the loan was closed that she was signing a contract for

Robert to "work it out of debt," get "him some money back," and then "turn it back." She stated that he told her she was signing a contract and that for over a year she knew nothing of the deed. She denied that anyone in the FHA office told her she was signing a deed. She said that she intended for Arnett to work the land long enough to pay it out of debt, make a living for himself, and make enough money to satisfy him. Nothing was said about the payment of any rent to her.

Nancy Lillard admitted: making the application for the FHA loan; receiving $13 from the proceeds of timber sold by Robert Arnett; that Arnett had made repairs to her home; that he had cleared about 3 acres of land with a bulldozer; that the $8,000 loan proceeds went to pay her debt; that she never asked Arnett to pay her any rent.

Appellee's version of the manner in which the proposal for refinancing arose is that Robert Arnett suggested the FHA application and took her to the office. She testified that he also proposed the arrangement to which she agreed after she was told that her loan application would not be approved.

She first expressed dissatisfaction when Arnett proposed to sell 80 acres of the land. She stated that she learned of this from sources other than appellants.

Seanes Boyce, the husband of a step-daughter of appellee, testified that Robert Arnett had told him that he was taking the place under a lease and was going to work it out of debt. He was unable to say whether this was before or after the deed was signed. Boyce's wife admitted telling Arnett that she was glad for him to take the place and lease it for a number of years because of her inability to do anything. It was not until Arnett proposed to sell some of the land that she discovered that the transaction involved a deed, not a lease. She testified that when all of the brothers and sisters ob-

jected to the sale, Arnett told her, appellee, and one of appellee's daughters that if they would give him $3,000 he would relinquish all rights and that if he had realized that heirs were involved, he would never have "fooled" with it. She denied knowing that Arnett proposed the sale in order to pay off the debt.

Evie Mallett, a daughter who had lived in St. Louis since 1942, said that Arnett told her in August of 1966 that he was going to work the place out of debt and turn it back to appellee just like it was. She testified that when they protested the proposed sale, Arnett said that he would turn the land over to them for $3,800, $300 of which was for the tractor he had taken over.

Edmond Lillard, a son of appellee, recalled that Arnett called him before anything was done, advising of his proposal to take the place and work it out of debt. His version of the conversation was that Arnett was going to return the land and wanted nothing for himself. He admitted a dislike for Robert Arnett.

Robert Arnett's version is somewhat different. He testified that he and appellee usually discussed their respective farming operations each fall. In the fall of 1964 he learned that Nancy Lillard did not know how much cotton she produced in 1963 and had no statement of her status. He said that he admonished her to attend to her business, and advised her to get a statement from her mortgagee, who apparently handled the disposition of her crops. He further stated that after she obtained one statement and lost it, he went with her to get another. According to him, appellee thought she could get help from the Forrest City Production Credit Association so appellants took her there, but she was told by them that the debt was at least $2,000 too great and that, in any event, they could only make a six- or seven-year loan to her. The parties also went to other lending agencies in Forrest City and in Marianna with the same result. Then, he said, appellee remarked that there

was only one other place to go—the FHA. When they went there, he related, Mr. Wilson told them that they could not make a loan to a non-operating owner and asked Nancy Lillard if there were not someone in the family she could let have the land. According to Arnett, she replied in the affirmative and said "Robert Arnett and Beatrice Arnett, my daughter and son-in-law." Arnett testified that he protested, not wanting to become involved with her children whom he described as hard to get along with, and suggested appellee's other daughter who lived in the vicinity. Appellee refused because of a lack of confidence in this daughter and son-in-law, saying that she would rather let the place go. Reluctantly, he says, he agreed to undertake to save the place if he could, because of his love for Nancy Lillard and the fact that his only child was a Lillard. He states that Wilson told appellee she would have to deed the property to appellants, but after the debt was paid, they could "fix it" however they wanted it; both Wilson and Ward at the FHA office told appellee she was signing a deed; appellee told him and his wife, "Now, you all take this land, work it out of debt, and work it as long as you want to and get you something out of it, and turn it back to me." After the papers were signed, it was his intention to farm the land as long as he lived and was physically able. He had to go to the hospital for surgery in 1966, and was unable to work thereafter. He then proposed to appellee that he sell 80 acres of the land for $14,000, pay the debt, and give her one-half of the sale proceeds in excess of the debt, a home on the remaining 40 acres for the rest of her life, and a share in the income therefrom.

After this proposal, the whole family came to call on Arnett, saying: "We come to get the place," and objecting to the sale. When appellee protested, he agreed not to sell the land and told the family if they wanted to get him out of the possession of the property, they would have to buy him out, but that he did not have to give up the land until the debt was paid out. It was

then that he proposed that they relieve him of the debt, pay him $3,800 and take the farm, the tractor, and equipment. They refused, so he told them he would pay the debt somehow. Every time any of the family told him he had not bought the place, he responded that, even if he had not, he had a 40-year lease on it.

He bought some additional farming equipment at a cost of approximately $2,500, for which he would have no need unless he farmed this land, and which was of no use to him after he had to quit farming. He also had to pay $240 in drainage taxes and an attorney's fee before the loan was closed. The first year, he had $200 left from the crop proceeds after paying all operating costs and debt payments, including $500 for living expenses. He gave appellee $50 of this remainder. He cleared 6 acres of the land for cultivation at a cost to him of $578, but received the proceeds of the sale of the timber, which may have been $500.

The chancellor found that:

(1) Appellee was unaware of the legal consesequences of the option, deed and bill of sale.

(2) Arnett's motives were not ulterior and he did not intend to take the land from his mother-in-law, but had agreed to pay it out of debt.

(3) That appellee thought she was signing a contract and Arnett thought it was a lease.

(4) That Arnett's action had resulted in a decrease of the interest rate from 10% to 5%, for which he should be compensated.

(5) That Arnett was the owner of the personal property formerly owned by appellee.

(6) That the 1968 rent contract entered into by appellants was valid, but they were accountable for $1,112

as the difference between the mortgage debt payment and the rent collected by them in advance.

(7) That neither appellants nor FHA were guilty of fraud, but there was a mistake of fact on the part of appellee and appellants.

The court's decree contained a finding that the deed conveyed only legal title, and that appellee retained the equitable title, subject to the mortgage debt.

On trial de novo, we agree with the chancellor on findings 1, 2, 4, 5 and 7, but do not agree as to the other findings. The court's decree leaves appellee with all the benefits of the action taken by the parties, to the detriment of appellants. We find that the evidence clearly shows an agreement between the parties that appellants take over the farm until the debt was paid and they made a profit, at the same time providing appellee with a home thereon as long as she lived, after which it would be reconveyed to appellee or her heirs and assigns. Their only mistake was in the failure of the contract document to express their agreement. The fault for this should be borne equally.

Appellants had relieved appellee of any personal liability for any indebtedness on the land or responsibility for its operation, had cleared the lien on her farming equipment, which they did not need unless Arnett cultivated the land, bought additional equipment for which they now have no need, assumed appellee's debts, for which they will remain personally liable, and encumbered their own home to secure them. Appellee did not offer to relieve appellants of any of these burdens, and the decree rendered did not do so.

We feel that the appropriate equitable remedy here is reformation of the deed to reflect the agreement of the parties, i.e.: to vest title in appellants as trustees of an express trust to cultivate the lands, or cause them

to be cultivated, and collect the rents, income, and profits therefrom, paying therefrom all taxes, insurance premiums on improvements, and costs of repairs and maintenance and the annual installments of the mortgage debt, and retaining any excess for their own use and benefit, and to maintain the dwelling house occupied by appellee as a home for her as long as she lives. The title to the property shall vest in her heirs and assigns as soon as the mortgage indebtedness is retired.

Equity will reform written instruments in two cases: (1) Where there is a mutual mistake—that is, where there has been a meeting of minds—an agreement actually entered into, but the contract, deed, settlement, or other instrument, in its written form, does not express what was really intended by the parties thereto, and (2) Where there has been a mistake of one party accompanied by fraud or other inequitable conduct of the remaining parties. *Welch v. Welch*, 132 Ark. 227, 200 S.W. 139; *American Alliance Ins. Co. v. Paul*, 173 Ark. 960, 294 S.W. 58.

We are not unmindful of Ark. Stat. Ann. § 38-106 (Repl. 1962), which requires all declarations or creations of trusts of any interest in land to be in writing. That statute is applicable where there is an express oral trust. *Umberger v. Westmoreland*, 218 Ark. 632, 238 S.W. 2d 495. However, it is not applicable here because neither party, in the trial below, pleaded or relied on the statute of frauds as a basis for affirmative relief or as a defense. In fact, on appeal, both asserted that the statute did not apply; the appellants for the reason that part performance took the trust out of the statute and the appellee for the reason that the statute of frauds does not apply to a constructive trust. Before a party may rely on the statute of frauds as a defense, it must be specifically pleaded. *Smith v. Milam*, 195 Ark. 157, 110 S.W. 2d 1062; *Rushton v. Isom*, 204 Ark. 804, 164 S.W. 2d 997. See *Young v. Paquette*, 341 Mass. 67 (1960); 167 N.E. 2d 308, Bogart, Trusts & Trustees 2d ed.

948

§ 71, p.58.    Further, in this case both parties, in their testimony, admitted the existence of the oral agreement which constituted the express trust.    This fact has been held to prevent the application of the statute of frauds to an express oral trust of an interest in land. *Trossbach . Trossbach,* 185 Md. 47 (1945), 42 A. 2d 905.

The decree is reversed and the cause is remanded to the chancery court for entry of a decree consistent with this opinion.

HOLT, J., not participating.