R. B. TURNEY v. WAYNE ROBERTS, ET AL

73-116                                        501 S.W. 2d 601

Opinion delivered November 13, 1973
[Rehearing denied December 17, 1973.]

504

*Charles W. Atkinson,* for appellant

*Jeff Duty,* for appellees and cross-appellants.

*Womack & Lineberger,* for intervenor and cross-appellee.

FRANK HOLT, Justice. The appellant, a Florida resident, brought this action to reform a $20,000 note and mortgage given to him by the appellees, Wayne Roberts and his wife, Hazel Bishop Roberts. Reformation was sought upon the allegations of fraud and other inequitable conduct on the part of the Robertses. Appellant Turney also sought foreclosure and subrogation as to a previous encumbrance (Denham) on the real property. The Robertses admitted execution of the note and mortgage and interposed usury as a defense. Subsequently, cross-appellee Richardson filed an intervention alleging that the Robertses were indebted to him for $3,000. He also sought subrogation. The Robertses invoked, *inter alia,* the statute of frauds to avoid payment of the Richardson loan. The chancellor sustained the Robertses' defense of usury and cancelled their note and mortgage to Turney who brings this direct appeal. The chancellor upheld the contentions of intervenor Richardson. The Robertses cross-appeal from that part of the decree favorable to Richardson.

Appellant Turney and cross-appellee Richardson had loaned $17,000 and $3,000 respectively to the Robertses to redeem their property (bid in for $33,250) before the actual sale in a foreclosure proceeding instituted by Edward Denham and his wife. After receipt of the alleged loans, the appellees paid into the court registry the sum of $19,424.21 to redeem their property.

We review the pertinent evidence with reference to both loans. For approximately a year preceding the Turney loan, the Robertses and the Richardsons had lived in Texas as neighbors and frequently visited each other. Richardson and the Robertses were employed at a Mexican Baptist children's home. During this time and before the $3,000 loan, it appears that the Robertses had borrowed money occasionally from the Richardsons and $862.62 of these loans remains unpaid. When the Denhams' foreclosure proceeding was instituted against the Robertses' Arkansas property, they endeavored to secure a $20,000 loan from the Richardsons. Roberts represented to them that the value of their Arkansas home and property was approximately $250,000 and, by the foreclosure proceeding, they would lose everything including opening a children's home, which they were planning to do. Roberts "bothered us all the time" about loaning him funds to pay off the Denham note. Roberts himself persisted to the extent he actually drafted a note and mortgage for $20,000, saying he would like to make it $25,000 in order to meet his needs for living capital. Richardson told Roberts that he and his wife were unable to raise the money for the requested loan. About a month later the Richardsons loaned $3,000 to Roberts when he exhibited to him a $17,000 cashier's check which represented a loan recently made to him by appellant Turney. Roberts insisted in his renewed plea for assistance he was in desperate need of another $3,000 and told the Richardsons their name would be on the $20,000 Turney mortgage. He gave them a receipt (check) indicating that the loan was part of a mortgage payment. No rate of interest was discussed. Roberts had shown them an abstract, deed and an appraisal of the property when he told them it was worth $250,000. He persuaded them to believe that he wanted to sell it and use the proceeds for building a children's home and the property had increased in value because an organization was going to build a shopping center on the Arkansas property. He assured them the loan would be needed no longer than three weeks. Through a minister friend, Arnold Lawrence Robertson, the Richardsons understood that appellant Turney was a very religious man who

devoted much of his time and effort to Christian work and projects.

Robertson, the minister, testified he had known appellant Turney and his Christian endeavors for almost twenty years. The minister further testified that he had known the Robertses for about seven years. He was in Texas and present when a discussion arose between the Robertses and the Richardsons about building a children's home. Roberts, however, mentioned that his Arkansas property was being foreclosed and Mrs. Roberts was upset and weeping about it. The possibility of getting money from foundations that build children's homes was discussed as a source of a loan. Robertson told the Robertses that he had no contacts in Texas and if he found anybody in Greensboro, North Carolina, where he was going he would let him know. Shortly thereafter, the minister was surprised when he received a call from Roberts who was in Greensboro. Roberts wanted to see a local individual which he was unable to do that day. The minister then called appellant Turney, a friend of his, in Orlando, Florida, and told Turney in Roberts' presence that Roberts, also a friend, was in Greensboro; that it would be necessary for him, Roberts, to borrow approximately $17,000 to pay off a mortgage on his home in order for him to be able to sell it and invest the proceeds in a children's home. Then he heard Roberts talk with appellant Turney on the phone telling him he would pay 10% interest on the requested loan and would give him a bonus if he, Roberts, could sell his property within a short time. He heard Roberts assure Turney that his home was valuable property which included fifty or sixty acres. As previously indicated, the minister and appellant Turney had been friends for several years. They had worked together in children's projects and each assisted in the Christian Missionary Movement called Transworld Radio.

Appellant Turney verified the minister's testimony about his introduction to Roberts by telephone from North Carolina. This conversation lasted about one hour. Roberts was in urgent need of $17,000 to pay off a mortgage on his home. He was so desperate he cried

during the conversation. Thereafter, Roberts persisted in calling Turney from different locations in Texas and said he would like to come to Florida. On September 3, 1971, after calling Turney, Roberts flew to Orlando where Turney picked him up at the airport. Roberts did not know whether Turney had funds for a loan; however, Turney and his wife went to a bank and raised $17,000 by pledging their son's college funds, a life insurance policy, and by cashing their savings bonds and checking accounts. Roberts had told Turney before he arrived that he would have a note and mortgage made to them on his Arkansas property which was worth $275,000. Roberts had with him one note for $20,000 dated September 1, 1971, drawing 10% interest, secured by a mortgage of even date payable in forty-five days. The length of the loan was determined at the bank. He also left his deed to the property. He was in Orlando about three hours during this transaction at the bank. Roberts again assured him that the property was worth between $250,000 and $275,000. Roberts "broke down and cried" at the bank when he received the $17,000 loan. At that time Roberts voluntarily, to Turney's surprise, acquired a blank note and completed it in the face amount of $5,000, without interest, and tearfully presented it as a gratuity or bonus to Turney. Roberts showed Turney some papers involving the sale of two pieces of property at $700,000 to $800,000. He assured Turney that within a month and a half that the large real estate transaction would be completed.

Turney testified that Roberts "assured me at the bank that he was well aware of all legal implications, and that's the reason why he had everything fixed up [$20,000 note and mortgage] before he came; and he assured me, gave me assurance that everything was right, and everything was above board. That's the reason why he had taken care of it so well. I was amazed with the experience that he seemed to have, and with the portfolio that he brought down with him, with—showing me the pictures of his property in Texas—the children and all like that." At the bank Turney told the banker he was loaning $17,000 to Roberts, showed him the mortgage, and consulted with the banker who said it "looks alright to me."

Appellant Turney testified that he and Robertson, the minister who introduced Roberts to him on the phone, were very close friends and that his introduction about Roberts was "good enough for me." Turney is on the board of directors of the Transworld Radio Gospel Broadcasting operation which broadcasts in 26 languages off the coast of South America. He spends each weekend trying to raise funds for this cause and pays his own expenses. Appellant is approximately fifty years of age, and has served in the U. S. Air Force as a supply systems analyst for twenty-seven years. For the past year he has been in business for himself. His experience in loan transactions is limited to the purchase of his house, buying a car, and a bank loan. In fact, he did not have the Roberts mortgage recorded until it became necessary to file a suit for collection of his loan. Although the appellant filed a verified complaint seeking recovery of $25,000 or the total of the two notes, he denied he authorized a local Florida attorney to instruct the Arkansas attorney to seek recovery in excess of the actual loan which was $17,000. The Arkansas attorney promptly amended the complaint to seek recovery of only $17,000 plus 10% interest per annum when it was first brought to his attention that this figure was the correct amount of the loan. Neither of the Robertses testified.

The chancellor correctly held that the transaction is usurious. Ark. Constitution, Art. 19, § 13, renders a contract void and unenforceable when the contract exceeds 10% interest. Here the loan bearing 10% interest was exceeded by $3,000. Obviously the chancellor was troubled in cancelling the indebtedness. As abstracted, he observed:

> Roberts deserves the strongest condemnation and by all basic equitable principles [clean hands], should be 'sent hence without day,' but for the strong public policy of this state. If it were not for the posture of Turney and the Constitution [Ark. 19, § 13] as construed by the Court, the decision would be against appellee.

We agree that the transaction presented a troublesome

problem in view of our rather strict interpretation of our usury law. However, we have long recognized that written instruments are subject to reformation. In *Arnett & Arnett* v. *Lillard,* 245 Ark. 939, 436 S.W. 2d 106 (1969), we said:

> Equity will reform written instruments in two cases: [1] Where there is a mutual mistake—that is, where there has been a meeting of minds—an agreement actually entered into, but the contract, deed settlement, or other instrument, in its written form, does not express what was really intended by the parties thereto, and [2] Where there has been a mistake of one party accompanied by fraud or other inequitable conduct of the remaining parties.

To the same effect is *Hervey* v. *College of The Ozarks,* 196 Ark. 481, 118 S.W. 2d 576 (1938), *Davidson* v. *Peyton,* 190 Ark. 573, 79 S.W. 2d 734 (1935), *Commonwealth Bldg. and Loan Assn.* v. *Wingo,* 189 Ark. 1033, 75 S.W. 2d 1008 (1934), *Barton Mansfield Co.* v. *Wells,* 183 Ark. 174, 35 S.W. 2d 337 (1931), and *Welch* v. *Welch,* 132 Ark. 227, 200 S.W. 139 (1918). In order to reform a written instrument, the evidence must be clear, convincing, and decisive. *Hervey* v. *College of The Ozarks, supra.*

In *Welch* v. *Welch, supra,* the court recognized that "[A]lmost all written instruments may be reformed when a proper occasion is furnished." In the case at bar, we are of the view "a proper occasion" is presented for reformation of the note and mortgage, based upon clear, cogent, and convincing evidence. The evidence is uncontradicted that the lender was mistaken in that be believed, due to the borrower's misrepresentations, that the transaction met the requirements ("legal implications") of Arkansas law. In addition, the borrower's conduct and misrepresentations certainly taint the transaction with fraud or at least with inequitable behavior. We perceive no valid rationale why a usurious contract is immune to reformation. Our usury law is not so ironclad nor designed to provide an impenetrable shield so as to prevent absolutely an action for reformation of a written instrument. We hold that the Roberts

note and mortgage should be reformed to reflect $17,-000 indebtedness, bearing ten percent per annum interest, to appellant Turney. To that extent the decree is reversed. However, we do not determine any subrogation rights as to appellant.

On cross-appeal the Robertses contend that the "court erred in subrogating Leonard E. Richardson to the rights and priorities of" the Denhams. Cross-appellants, the Robertses, invoke the statute of frauds with respect to the collection of the $3,000 Richardson Loan. They make the argument there is nothing to support the existence of this loan other than the testimony of Richardson and his wife that their name would be on the $20,000 mortgage which the Robertses had executed to Turney. Further, they assert there is no evidence that the $3,000 borrowed from the Richardsons was for the purpose or used to redeem the Roberts land from the foreclosure proceedings. We disagree. The cashier's check for $19,424.21 made payable to Denham on September 16, 1971, (following both loans) in redemption of their property from the foreclosure sale, is marked "R. D. Turney and T. [L.] E. Richardson for Wayne Roberts." Roberts' individual check (apparently a receipt), also dated September 16, 1971, was made payable to Richardson and marked "Loan balance on Denham payoff of purchase price money on 10 A. Real Prop." This coincides with the date of the Richardson loan. Therefore, as the chancellor held, the evidence is amply sufficient that the Richardsons loaned $3,000 to Roberts to pay off the Denham indebtedness and, further, the evidence is sufficiently clear to take Richardson's claim out of the statute of frauds which the Robertses asserted as a defense to payment of the loan. As the chancellor held, Richardson is entitled to subrogation to the rights and priorities of the Denhams. The doctrine of subrogation is of equitable principles. *Cowling* v. *Britt,* 114 Ark. 175, 169 S.W. 783 (1914). Whenever one loans money to another to pay off a realty encumbrance with the understanding that the loan is for that purpose, he is entitled to be subrogated to the rights of any previous encumbrances. *Stephenson* v. *Grant,* 168 Ark. 927, 271 S.W. 974 (1925).

The Robertses, as cross-appellants, next contend that the court erred in rendering any judgment against Hazel Bishop Roberts, wife of Wayne Roberts, as to the $3,000 Richardson loan. We find merit in this contention. We do not consider, as asserted by Richardson, the issue is raised the first time on appeal. In answer to Richardson's intervention, Mrs. Roberts, in her joint answer with her husband, raised the issue of her alleged indebtedness by a general denial. The record, as abstracted, does not appear to reflect the parties presented memorandum briefs limiting the issues. As to the evidence, a cashier's check, previously mentioned, was remitted by Turney and Richardson "for Wayne Roberts" as payment of the Denham judgment. Richardson himself testified, as to his individual loan, "Mr. Wayne Roberts is the one who asked us [Richardson and his wife] for it and it was loaned to Mr. Wayne Roberts."

The decree is affirmed as to Richardson's judgment except as to Mrs. Roberts. The decree is reversed and the cause remanded on direct appeal and on Mrs. Roberts' cross-appeal for proceedings not inconsistent with this opinion.

Affirmed in part and reversed in part.